ROGERS, Appellant, vs. VAN NORTWICK and others, Respondents, and MARINER, Appellant.

*March 20 — April 10, 1894.*

*Equity: Laches.*

1. A delay of more than three years in bringing an action to compel a transfer to plaintiff of corporate stock alleged to have been purchased for him and to have been fraudulently taken by the defendant to himself,— the plaintiff having all the time had knowledge which, if acted upon with reasonable diligence, would have led to a discovery of the facts, and the stock having in the meantime very greatly increased in value,— is *held* to have been such laches as would preclude a recovery.

2. Financial embarrassments of the plaintiff, and the complication of his affairs with the interests of defendant, to whom he owed large sums, are *held* not a sufficient excuse for the failure to act with diligence.

APPEAL from the Superior Court of *Milwaukee* County. This action was commenced January 27, 1890, against John Van Nortwick, of Batavia, Ill., since deceased, and the Green Bay & Mississippi Canal Company, defendants. The executors of said Van Nortwick, *William M. Van Nortwick*, and *John S. Van Nortwick*, as well as divers others, were afterwards made defendants, upon whom the summons and complaint were served by publication of summons and mailing copies of summons and complaint. The object of the action was to recover 1,197 shares of stock of the Green Bay & Mississippi Canal Company, of the par value of $100 each, of which it was claimed said John Van Nortwick became trustee for the use of the plaintiff *ex maleficio*, in consequence of having, in September, 1886, fraudulently procured said shares to be assigned to himself by Erastus Corning, from whom they had been purchased, when they should have been assigned to the plaintiff, *Rogers*, who claimed to have been the real purchaser thereof; and it was alleged that the plaintiff applied to A. L. Smith, of Appleton, then the agent of said Corning, to aid him in purchasing said shares of stock from said Corning; that Smith had ascertained that Corning would sell the same for $10,600, which the plaintiff then and there agreed to pay; that said shares were sent to said Smith by Corning accordingly, and that Smith, upon the receipt thereof, supposing and believing that the plaintiff had purchased them for the said John Van Nortwick and as his agent, advised the latter of the arrival of said stock and that it had been purchased for him at the agreed price of $10,600, but did not notify the plaintiff of having so received the stock or that he had written the defendant Van Nortwick to the

Rogers vs. Van Nortwick and others.

effect aforesaid; that the said Van Nortwick paid the pur-
chase price, and so obtained a transfer of said shares; that
the plaintiff for a long time afterwards was ignorant that
the said shares had been sent to Smith by Corning, and
of the transaction and correspondence between Smith and
Van Nortwick in reference to the transfer thereof to him;
that Van Nortwick fraudulently and deceitfully availed
himself of the mistake of said Smith in believing that the
plaintiff had purchased said shares for him, Van Nortwick,
and that the latter, fraudulently contriving by means of
his knowledge of such mistake to deprive the plaintiff of
his purchase, paid said sum, and obtained the transfer
of said stock on the 7th of October, 1886, when a new cer-
tificate for said shares was issued upon the books of said
company; that the transfer on the books was by mistake
on the part of the company, whose secretary Smith was,
upon the supposition that the plaintiff had purchased the
stock from Corning for the defendant Van Nortwick. The
complaint alleged a demand of Van Nortwick for the trans-
fer of the shares to the plaintiff, and tender of the said sum
of money, and the refusal of Van Nortwick to accept the
same. The plaintiff prayed for a transfer of said shares to
the plaintiff, and obtained an injunction in the meantime re-
straining any other disposition of them.

On the 21st of September, 1891, a second amended and
supplemental complaint was filed, making *Ephraim Mariner*
a party defendant, and alleging the employment by the
plaintiff of Smith as his agent, as well as his own, to pur-
chase said stock from Corning, and Smith's promise to do
so; that both Smith and the plaintiff were residents of
Appleton, Wis., intimately associated in confidential, social,
business, and financial matters, and were stockholders, offi-
cers, and directors in the corporation defendant, as well as
other corporations; that Smith made the purchase from
Corning, as before stated, and received the stock with a

blank transfer thereof and power of attorney, but neglected to inform the plaintiff of the fact until after Smith had turned said stock so assigned and transferred over to said Van Nortwick, and it had been transferred on the books of the defendant corporation to him; that said purchase was made by the plaintiff in fact for himself and the defendant *Mariner*, and they had no knowledge or notice of the receipt of said stock by said Smith until long after it had been transferred to Van Nortwick; that Van Nortwick had notice of these facts, and that the transfer was secretly and dishonestly made, in disregard of the confidential and trust relations which existed between all the parties, and that Van Nortwick induced Smith to ignore and disregard his duty in the premises as plaintiff's agent, and to wrongfully deliver said stock to said Van Nortwick; that Smith did not apprise the plaintiff or *Mariner* of the receipt of the stock, or of any of the facts or transactions which had taken place between himself and said Van Nortwick and his son *William* in relation thereto. Demand of the stock and tender of the purchase price thereof to Van Nortwick is alleged; also that in the month of June, 1889, plaintiff consulted counsel with reference to his rights and claims, and left the matter in his attorney's hands, with instructions to take such steps, whether by suit or otherwise, as he might deem advisable; and it so remained in his hands until the commencement of the action; that Van Nortwick died April 1, 1890; that his personal representatives, during twelve months prior to the commencement of the action, and afterwards, had made overtures to said *Mariner* for a settlement of his claim against them, and offered to give him 250 shares of said stock, and that such negotiations were still pending; that he had requested *Mariner* to join with him as a plaintiff in the action, but he had hitherto and still refused. Appropriate relief is prayed.

Defendant *Mariner* filed a cross complaint in respect to

his interest or claim in or to said stock, founded on sub-
stantially the same grounds as the plaintiff's claim, and
prayed that the said 1,197 shares be made over to him and
the said plaintiff upon the payment of said purchase price
of $10,600, with interest, and for other and further relief.

It was charged in the complaint, and also in the answer
of *Mariner*, that Smith concealed from *Rogers* that he had
agreed with Van Nortwick to make over to him the said
stock when it arrived, and not to make it over to the
plaintiff and said *Mariner*. It also appears in the com-
plaint, and also in said answer, that shortly after the trans-
fer of the stock to Van Nortwick, *Mariner*, having learned
thereof and not being aware of the secret arrangements
between Smith and Van Nortwick, applied to the plaintiff,
who was not then aware thereof, to tender the amount
paid for the stock and request a transfer of the same to the
plaintiff and said *Mariner;* that a large part of the plaint-
iff's estate was in the hands of said John Van Nortwick,
and his relations with and his business obligations to him
were such that he dared not then immediately press the
matter, but that he would, as soon as he could, have a
looking over of their business affairs, and would request
him to make the transfer, and the plaintiff requested
*Mariner* to let the matter rest until then, as he did; and it
was alleged in said answer that neither John Van Nort-
wick, in his lifetime, nor either of his executors, until about
midsummer of 1891, advised the plaintiff or *Mariner* of the
agreement between the said Smith and said Van Nortwick
and his son *William,* by which Smith agreed not to deliver
the Corning stock to the plaintiff and said *Mariner,* but to
deliver the same to the said John Van Nortwick, and that
they were both ignorant thereof until midsummer, 1891,
and believed up to that time that the delivery by Smith of
said stock was an accident, growing out of the fact that
stock purchased under an original agreement between the

parties some years prior to that time had been purchased by the direction and through the negotiation of the plaintiff, *Rogers*, and had been paid for by the said John Van Nortwick, and the certificates delivered to him. The negotiations between *Mariner* and the personal representatives of Van Nortwick, touching the matter in difference between them and said *Mariner*, are stated in his answer, and it is alleged that a compromise was agreed on, by which they were to deliver to him 250 shares of the stock, but they subsequently refused to perform it.

The answer of the executors of John S. Van Nortwick put in issue the principal matters relied on as a ground of relief, and insisted on various other matters as a defense, and, among others, the acquiescence and laches of the plaintiff and said *Mariner* to enforce their alleged claim to the shares of stock, and that they were cognizant of all the facts from the early part of October, 1886, until the commencement of the action in January, 1890. It denied all allegations of confederacy, conspiracy, fraud, or unjust dealing alleged in the complaint.

It appeared at the trial, in substance, that the plaintiff and John Van Nortwick and the defendant *Mariner* and others had entered into an agreement in 1880 to buy up the stock of the Green Bay & Mississippi Canal Company in the name of John Van Nortwick, who was to pay the purchase money and be repaid by the other parties to the agreement when their stock was delivered to them, with interest. In order to carry it out, the plaintiff took A. L. Smith with him, who was the secretary of the company and acquainted with all the stockholders, and bought up a majority of the stock, for which Van Nortwick paid the purchase price, and the plaintiff, as a part of the bargain, gave the stockholders certain indemnity against claims for flowage damages or other liabilities of the company. *Mariner* was to have 1,000 shares of the stock, but succeeded in

Rogers vs. Van Nortwick and others.

getting only 440 shares.  In 1886, failing to get the remainder, he and the plaintiff agreed that they would get Smith to write Mr. Corning to purchase his stock, and about the 1st of September, 1886, the plaintiff applied in person to Smith, then secretary of the company and agent of Corning, to open negotiations for the purchase of the shares. He states: "I met Smith nearly in front of Pettibone's store in Appleton, and asked him what I could get the Corning stock for.  He told me he didn't know exactly; that it had been offered the year before for $10,000, and it probably couldn't be bought for any less, and it would no doubt cost more.  I asked him to get the lowest price he could for it, and let me know, which he agreed to do.  A short time afterwards I met him again, and he told me I could get the stock for $10,600.  I told him to send for the stock; that I would take it.  He agreed to do so."  Smith, on the 9th of September, 1886, writes Corning in relation to a previous offer of Van Nortwick of $10,000 for his stock in the company, and that neither party had since said anything about it, "until now Mr. Van Nortwick again makes the offer of $10,000, and asks me to submit it to you.  You have 1,197 shares, and this offer is over $8 per share, and it would seem to me not a bad thing for you to take it. . . . If you will send me the stock with instructions to sell it, fixing your price, I will try and get it for you, though I think $10,000 is the outside figure.  Still we will try and get $700 as interest since the offer of $10,000 was made." The matter was left by Corning in Smith's hands to do the best he could for him, by letter dated September 18, 1886. On the 21st, Smith advised Corning that he could get $10,600 for the stock, and that if he would send it to him assigned he would make the proper transfer and remit $10,600.

Up to this time it appears Smith supposed from the previous dealings of the parties that this stock was to be pur-

chased, as the other had been, in the name of John Van
Nortwick, and paid for by him, but soon thereafter the
plaintiff informed *William M. Van Nortwick*, son of John
Van Nortwick, that he had purchased the Corning stock
for himself and *Mariner*, and he, said *William M.*, went
home and told his father of such purchase. John Van
Nortwick wrote Smith by letter, dated September 30th,
which the defendants declined to produce, and Smith testi-
fied that his copy of it was lost, the contents of which are
not known further than that Van Nortwick told Smith
that *Rogers* claimed to have purchased the Corning stock
for himself and *Mariner*. The result was that Smith wrote
Van Nortwick a letter, dated October 2, 1886, in which he
said: "Yours of the 30th ultimo is received. Your letter
was a great surprise to me, in the matter of the Corning
stock. I bought this stock for you. I wrote to Mr. Corn-
ing that I wanted it for you. You remember about a year
ago I succeeded in getting a refusal of the stock for you,
but you did not seem to want it then. When *Mr. Rogers*
asked me to see if I could not get it now, while he did not
distinctly state, as I remember, though he may have done
so, I certainly supposed that it was on your account. I
therefore wrote to Mr. Corning that you would take the
stock. . . . He wrote me that I could sell it to you
for what he had offered it to you a year before, and inter-
est, which I figured at six per cent., calling the amount
$10,600. I understood *Mr. Rogers* that he would accept
it, or that it was all right, and to send on for the stock.
. . . I am now, if what you say is the fact, in a very
serious dilemma. I bought this stock for you. Mr. Corn-
ing supposes it is to go to you, and I do not suppose he
would have sold it at these figures if he supposed there was
anybody in the market for it besides yourself." Smith tes-
tified that by the letter from John Van Nortwick of Sep-
tember 30th he understood that *Rogers* claimed that he had

applied to him to purchase the stock for his own and *Mariner's* account; that he did not say anything to *Rogers* about this until after he had sent the stock to Van Nortwick; that *Rogers* was in Appleton at the the time; *that he used to see him very frequently.*

On the 4th of October Van Nortwick answered Smith's letter of the 2d, requesting him to "close up the purchase of the Corning stock, and notify me of the amount of money required, and I will send it to you." On the same day *William M. Van Nortwick* wrote a letter to Smith, remitting $10,600 "to pay for the Corning stock," adding a postscript: "Mr. Corning can send the stock direct to me, and not go through your hands, if you choose to do so." On October 5th, Corning's agent remitted to Smith at Appleton "certificate No. 40, for 1,197 shares of Green Bay & Mississippi Canal Company stock, standing in Mr. Corning's name, and power of attorney for you to transfer the same to the gentleman, Mr. Van Nortwick, who has purchased the same." October 6th, Smith wrote *William Van Nortwick* that his letter of the 4th had been received, and also the one from his father, and saying, "You must not forget that I did negotiate this stock for your father." On the 7th of October Smith wrote John Van Nortwick, inclosing the stock to him. On October 9th, Smith writes to *William Van Nortwick:* "Did you tell *Mr. Rogers* that I knew, or that you had informed me, that he intended to get that stock for *Mariner?*" Written across the face of this letter, by *William Van Nortwick,* is the following: "Father was very much put out about this matter, and thinks as I expressed it on the other side of this sheet. When I was at Appleton, *Mr. Rogers* said he was going to buy the Corning stock for *Mariner.* On my arrival home I advised father, and he at once wrote you to buy the stock for him, as he said he wanted it, and you had written him you would soon have the stock for him." On the reverse

side was a letter from *William Van Nortwick* to Smith, marked " Confidential," dated October 11th, asking, among other things: "What did *Mr. Rogers* say to you about buying the Corning stock for *Mariner?* Did he ever say that he wanted it for *Mariner?* He said here he ordered you to buy the stock, and you wrote me you supposed it was for father. Why did he not say to you, when he asked you to buy the stock, it was for *Mariner?* . . . The only reason father did not buy the stock and close the matter up sooner was the hope of getting it at a lower price. . . . We feel under many obligations to you, and but for you I guess we would have lost it. WILLIAM M. VAN." In October John Van Nortwick and *William Van Nortwick* wrote Smith a letter, not dated, with the following postscript: *Mr. Rogers* was here a day or two ago, and we informed him the money had been sent to pay for the stock of Mr. Corning." October 11, 1886, *William M. Van Nortwick* wrote Smith a confidential letter, saying: " The first that I heard about the Corning stock matter was when I was at Appleton. *Mr. Rogers* said, ' I am going to buy the Corning stock for *Mariner.*' I was surprised, and said: ' That is very strange. I supposed father was going to have that stock. He has been negotiating through you and Smith for it for several years.' His reply to me was, ' Gust says your father did not want the stock, or your father said to Gust he did not want the stock.' I did not say anything more until I came home. I asked father about it, and he said he expected to have the stock, and never said he did not want it. The way father and the rest of us think, *Rogers* was going to buy the stock for *Mariner*, and they were going to divide it between themselves. We would like to have some evidence that this is not the fact."

The plaintiff, in his evidence, admits having a conversation with *William* and John Van Nortwick at their office

in Batavia about ten days or two weeks after the transfer of the stock, and that he had previously received a letter from *William M. Van Nortwick,* berating him about the matter. " I asked what was going to become of this Corning stock. They said they did not want *Mariner* to have any more stock. I said, ' Why in the world didn't you tell me of this before now?' . . . I was excited, and told him that I had bought this Corning stock in good faith for myself and *Mariner,* and that I wanted it. Both John Van Nortwick and *William* did participate in the conversation." He further testified that when he learned of the transfer to Van Nortwick he went home to see Smith. Smith told him he had sent the stock to Mr. John Van Nortwick, and had received the pay for it. That he told Smith: "I bought this stock for myself, Mr. Smith. I bought this for myself." Smith expressed himself as very sorry that the transfer had been made, because, had he known it was for the plaintiff, he would just as lief have transferred it to him. He supposed it was going in the same way that all the stock had gone,— to Mr. John Van Nortwick, as before. It was further testified that the first time the plaintiff knew that Smith knew before he received the stock from Corning that the plaintiff had employed him to negotiate with Corning for it for the benefit of himself and *Mariner,* was when he was so informed by *Mariner,* in the summer of 1891, and that the latter told him that he had derived his information from an inspection of Smith's letters to Van Nortwick, and *Mariner* testified that he first saw the letters in Mr. Quarles's office in the summer of 1891; that up to that time he supposed Smith had transferred this stock to Van Nortwick, supposing that the original request was made to the plaintiff to buy the stock from Corning on behalf of the parties in interest in the former purchase; that when he saw these letters it was the first knowledge he had that Smith knew,

at the time he transferred the stock to Van Nortwick, that the plaintiff had applied to Smith on his own behalf, and that the Van Nortwicks knew it.

*Mariner* knew of the transfer of the stock to Van Nortwick in 1886, and requested the plaintiff, in connection with him, to tender the amount due for it to John Van Nortwick and demand a transfer of it.   He knew at this time that Van Nortwick refused to recognize any claim on his part to this stock.   He never filed any complaint or cross answer, or took any action in court until December, 1891. December 15, 1886, *Mr. Mariner* wrote to Smith: "I presume *Mr. Rogers* has spoken to you in regard to the miscarriage of that Corning stock.   I wish you would send me a copy of your letters to Mr. Van Nortwick in regard to the same.   The stock was purchased for *Mr. Rogers* and me, and not for Mr. Van Nortwick at all; and I propose to have my share of it if I can get it.   I would like also a copy of Van Nortwick's letters to you in regard to it. Please advise me also of the amount paid Mr. Corning, the number of shares of stock transferred, and the date of payment, and much oblige."   Mr. Smith wrote, in reply, on the 16th, a portion of which is illegible, in substance, that *Rogers* told him that he had written *Mariner* in regard to the Corning stock.   "I did not know that you wanted that stock.   *Mr. Rogers* never mentioned to me that you were to have the stock.   *Rogers* himself told me about it afterwards.   At the time I bought the stock I bought it for Mr. Van Nortwick.   I agreed some time ago — several years ago — to give Mr. Van Nortwick the stock.   .   .   . I will talk with you about this some time."   (Rest undecipherable.)   It does not appear that Smith ever made any explanation to *Mariner* on the subject, or that the latter did anything further to procure the letters or copies thereof. Smith also testified that when Mr. Felker, plaintiff's attorney, called on him for the correspondence of the Van Nort-

wicks, just before the action was brought, he showed him all the correspondence he had on the subject; that he came to his office, and talked with him about it; that he told him he would send him the correspondence, but did not remember sending him any.

It appears that the plaintiff, February 20, 1888, wrote to John Van Nortwick a letter inclosing a list of canal company water powers, and estimate of their value, saying, among other things: " In the original purchase of canal company stock you set aside for me 1,600 shares. You have not apportioned to me *any of the purchases made since,* but I have no doubt you have thought of it. Now, I don't want to worry you or annoy you, but I do want to get out of debt, and I want to continue in business with your sons, holding as large an interest as I can with them. We have been in business together now about fifteen years, and have been fairly successful, and I see no reason, if it is agreeable to you and them, why it should not continue. I do not want to make you a proposition, because, if you remember, I never made you one. All the interest I have in our business has been apportioned out to me just as it has been to your sons,— by yourself. I make no claim on you for having been the means of getting together this property, or for its management. You know what we have and its value, and I appeal to you to help me out of debt."

*William Van Nortwick* testified that the reason his father did not take the stock when it was offered to him for $10,000 in substance was that he wanted to get it cheaper; that the price was in advance of what they had paid, but his father would not take it then. Smith further testified that when he sent the stock to Van Nortwick he already had information that the plaintiff claimed he had bought the stock for himself; that he did not say a word to *Rogers* about his information in respect to its sale to Van Nortwick until after he had sent the stock to Van Nortwick, though

he presumed *Rogers* was in Appleton all the time, and used to see him very frequently. He made no attempt to find him after he found out that *Rogers* claimed to have bought the stock. He did not communicate to him the information he got from John Van Nortwick before sending the stock to him; never spoke to him about it. When the stock came he sent it to Van Nortwick and got his draft in payment, without saying anything to *Mr. Rogers* at all. In regard to the stock of the company he testified the first stock, in 1880, was bought for $5 a share; that between that and 1886 the only sale of stock was Mr. Corning's; that sales were made in 1890 at eighty cents on the dollar; that he sold some himself about that time for eighty-five cents; that there were changes in the condition of the property, which affected its market value, by reason of a decision of the supreme court on the subject of riparian rights and touching the franchises or titles of the company that very favorably affected the value of its property; that there was a sale of a dam at Cedar Rapids, which fixed the value of the water power and gave an increased value to the stock; and that large improvements had been constructed between 1886 and January, 1890.

The superior court found that Smith at no time understood he was acting as the agent of *Rogers* in the purchase of the stock, nor did he act or agree to act as his agent in the transaction, and that he acted as agent for Mr. Corning, from whom he received the power of attorney authorizing him to sell the stock to John Van Nortwick, and held that the plaintiff never at any time acquired any property, right, title, or interest in or to the stock in question, and that neither the plaintiff nor the defendant *Mariner* was entitled to any relief; and judgment was rendered accordingly, from which the plaintiff and the defendant *Mariner* appealed.

*Charles W. Felker*, for the appellant *Rogers*, to the point

that only when the delay is of such a character as to amount to an equitable estoppel will the right of action be limited to a less period than the statute of limitatations, cited *Scherer v. Ingerman*, 110 Ind. 428, 433; 12 Am. & Eng. Ency. of Law, 545; *James v. Work*, 70 Hun, 296, 301; *Hawley v. Cramer*, 4 Cow. 717, 718, 742; *O'Dell v. Rogers*, 44 Wis. 183.

*E. Mariner, in pro. per.*

For the respondents there was a brief by *Quarles, Spence & Quarles,* and oral argument by *Chas. Quarles.*

PINNEY, J.   Without considering whether the evidence supports the contention that Smith acted unfaithfully as the plaintiff's agent, so that John Van Nortwick, by his interference, fraudulently persuaded Smith to deliver to him the stock in question assigned in blank, with the accompanying power of attorney, when he ought to have held it for or delivered it to the plaintiff, whereby Van Nortwick acquired the legal title to it, but became a trustee of it, *ex maleficio,* for the plaintiff, we are of the opinion that the appellants are precluded by their laches from obtaining the relief which they seek.   It is said in *Hammond v. Hopkins,* 143 U. S, 224, 250:   " No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith, and reasonable diligence, and will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. . . . Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of proba-

Rogers vs. Van Nortwick and others.

ble grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like. *Marsh v. Whitmore*, 21 Wall. 178; *Landsdale v. Smith*, 106 U. S. 391; *Norris v. Haggin*, 136 U. S. 386; *Mackall v. Casilear*, 137 U. S. 556; *Hanner v. Moulton*, 138 U. S. 486." The party in such case "must state in his bill distinctly the particular act of fraud, misrepresentation, or concealment; must specify how, when, and in what manner it was perpetrated; . . . and especially must there be distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see whether, *by the exercise of ordinary diligence*, the discovery might not •have been made before" (*Stearns v. Page*, 7 How. 819, 829); "otherwise [as was held in *Badger v. Badger*, 2 Wall. 87, 95] the chancellor may justly refuse to consider the case, on his own showing, without inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer." *Hardt v. Heidweyer*, 152 U. S. 547, 558. Upon the subject of laches and acquiescence, see, also, 1 Beach, Mod. Eq. Jur. §§ 18, 19, and cases there cited.

A court of equity applies the rule of laches according to its own ideas of right and justice, and the courts have never prescribed any specific period applicable to every case, like the statute of limitations; and what constitutes a reasonable time within which the suit must be brought depends upon the facts and circumstances of each particular case. *Brown v. Buena Vista Co.* 95 U. S. 157, 160; *Wood v. Carpenter*, 101 U. S. 140, 141; *Twin-Lick Oil Co. v. Marbury*, 91 U. S. 587. The rule is peculiarly applicable where the property, the subject of litigation, is subject to rapid or frequent changes in value, as stocks, oil wells, mining property, and the like. *Twin-Lick Oil Co. v. Marbury*,

Rogers vs. Van Nortwick and others.

*supra; Johnston v. Standard Mining Co.* 148 U. S. 360, 370. Many considerations applicable to actions for specific performance have a strong bearing upon a case like the present, where the appellants seek to obtain the benefit of a purchase of property which another fraudulently has taken to himself. The cases in respect to laches and change in value in actions for specific performance are fully collated and considered in *Combs v. Scott,* 76 Wis. 662. In very many cases a much less delay than occurred in this case has been held to bar relief, on the ground of laches or acquiescence.

It is argued that laches or acquiescence, in order to operate as bar, must be such as will amount to an estoppel, and such, no doubt, is the rule in cases where the cause of action is a legal one. Where it is purely of an equitable character (and not founded on any strictly legal right), there the rule in equity as to what will constitute a bar as stated in the cases already cited applies, and unreasonable and unexplained delay is sufficient to bar relief. The distinction between the rule in actions founded on a strictly legal title and purely equitable actions is pointed out in *Galway v. Metropolitan El. R. Co.* 128 N. Y. 132, 153, 157. See *Menendez v. Holt,* 128 U. S. 523.

It was further contended that *actual* knowledge of the fraud, mistake, or concealment is essential to make diligence in the prosecution of one's right a duty in order to lay a foundation for the claim of laches or unreasonable delay, and it is said in cases cited that it is sufficient " if the suit is commenced within a reasonable time after the evidence of the fraud was discovered," and that " reasonable diligence is, of course, essential to invoking the action of the court; but what is . reasonable diligence depends upon the facts of the particular case; " and that, " where a party injured by fraud is in ignorance of its existence, the duty to commence proceedings arises only upon dis-

covery." *Maeder v. Norton*, 11 Wall. 458; *Kilbourn v. Sunderland*, 130 U. S. 518. The question, however, remains: What will be considered a discovery of the fraud, and what is reasonable diligence in that behalf? This is answered by the well-settled rule of pleading already noticed, requiring the plaintiff to distinctly state in his complaint, and prove at the hearing, the time of the discovery and what the discovery was, " so that the court may really see whether, by the exercise of *ordinary diligence*, the discovery might not have been made before." *Stearns v. Page*, 7 How. 819, 829, and *Badger v. Badger*, 2 Wall. 87, 95. In *Johnston v. Standard Mining Co.* 148 U. S. 370, it was held that " the law is well settled that, where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Wood v. Carpenter*, 101 U. S. 141; *Kennedy v. Green*, 3 Mylne & K. 699, 722; *Erlanger v. Sombrero Phosphate Co.* L. R. 3 App. Cas. 1231, 1280; *Carr v. Hilton*, 1 Curt. 390, 394; *Buckner v. Calcote*, 28 Miss. 432. And the duty is all the more peremptory where the property itself is of uncertain value, and considerable expenditures are being made, and it is liable to greatly increase in value. In such cases the courts look with disfavor upon the claims of those who have waited to decide, when the danger is over, which has been at the risk of another, to come in and claim the profit of the event. *Cox v. Montgomery*, 36 Ill. 396. Poverty or pecuniary embarrassment is not a sufficient excuse for postponing the assertion of one's rights. *Hayward v. Nat. Bank*, 96 U. S. 618.

In view of these well-settled principles governing the question of laches and acquiescence, we feel compelled to say, under the facts and circumstances of this case, that the appellants have not shown proper diligence in ascertaining

their rights or in bringing them before the court. They knew, or at least the plaintiff did, and, as they were jointly interested, each is probably affected by what the other knew, that as early as the middle of October, 1886, John Van Nortwick had induced Smith to let him have the 1,197 shares of Corning stock, which, as they claim, he agreed to purchase for the plaintiff, and really for the benefit of both of them. *Rogers* knew before Smith had sent the stock to Van Nortwick that the latter had sent the money for it to Smith and expected to get it, and he knew that Smith had not informed him of what Van Nortwick was attempting or expecting to accomplish about it. In a few days after he learned that Van Nortwick had succeeded in getting the stock, and though both Smith and plaintiff lived in Appleton, and met almost daily, Smith did not report to him or say a word to him on the subject. This was enough to indicate that, if the plaintiff's version of his arrangement with Smith is true, Smith had been unfaithful to and had betrayed his interests and the confidence he had placed in him. Seeking an explanation of Smith, the latter insisted that it was all the result of mistake; that the stock had been sent to Van Nortwick and that he had supposed that the plaintiff was purchasing for Van Nortwick. If mistake it was, it had all the effect of a fraud as against the plaintiff and *Mariner*. It was evidently well understood that the entire matter had been managed by correspondence, and it does not appear that the plaintiff ever called on Smith to show him either what he had been doing as his agent, or the correspondence in question, until about three years afterwards, when, as Smith testifies, he showed all the the correspondence he had on the subject to Mr. Felker, the plaintiff's attorney, who was about to bring this action. Subsequently, Smith placed the correspondence in the hands of Mr. Quarles, who showed it to *Mr. Mariner* in the summer of 1891, and this is the discovery then made, relied on to re-

but the claim of laches. When the plaintiff brought the action, in January, 1890, after a lapse of three years and three months, in his verified complaint he charged Van Nortwick with having deprived him of this stock by fraudulently availing himself of Smith's alleged mistake. There is nothing to show that the plaintiff, when he brought the action, had found out or discovered any fact that he did not know perfectly well fully three years before; and the correspondence had been recently shown to his attorney by Smith, who would probably have shown it earlier had he been called on for that purpose. Had he refused, the plaintiff could have brought his action, as he finally did, and compelled the production of the correspondence, and ascertained all the facts on the subject by an examination of the parties that now appear in the record. He could have obtained jurisdiction of the parties in the same manner as in the pending action by publication of summons and mailing the complaint. The appellants had knowledge of facts and circumstances which, if they had acted upon them, would doubtless have brought out very directly the real facts as they now appear. The plaintiff supposed, he says, that Smith had acted innocently in making the transfer to Van Nortwick, but *Mr. Mariner* took, it seems, a different view of the matter, and on the 15th of December, 1886, he applied by letter for the correspondence, but on the next day Smith wrote him, promising to "talk with him about this matter some time." It does not appear that he sent the correspondence, and it would seem that nothing further, in any form, came of the matter. No reason which the law can approve is shown why the action was not brought as early as December, 1886. It would seem that Mr. Mariner did nothing in his own right about the matter, although there was no real obstacle to an investigation, until December, 1891, over five years after the transaction in dispute, when he filed his answer and cross

complaint, claiming that in the previous summer he had discovered from this same correspondence, as it is claimed, what he might have ascertained, with reasonable effort, years before,— that the Van Nortwicks had an agreement with Smith not to deliver the Corning stock to the plaintiff, but to John Van Nortwick. In the meantime the condition of the company and of its stock had greatly changed. An important decision on doubtful questions relating to its franchises and riparian rights had been made by the court of last resort, by which they had become more valuable; large investments had been made in improvements, and the Corning stock, bought in 1886 for $10,600, was worth, as the evidence shows, when this action was brought, nearly ten times that amount. The appellants had not, in the meantime, advanced any money; they had taken no risk, and seemed to have acquiesced in the transaction by which Van Nortwick got the stock for the price named; at least no earnest effort had been made to question his right to the stock until it had so greatly increased in value. The financial embarrassments of the plaintiff, and the complication of his affairs with Van Nortwick's interests, to whom he owed large sums of money, and which induced him, it is said, and *Mr. Mariner* at his request, to forbear suing for their rights, were no excuse for their neglect to act with reasonable diligence upon the facts and circumstances brought to their attention at the time, and which, if acted upon, would have brought to their knowledge, with but little delay, all they claim to have since discovered. Besides, the letter of the plaintiff of February 20, 1888, to John Van Nortwick, is very strong evidence, in connection with his delay, to show acquiescence, on his part at least, in the transaction which, more than two years afterwards, he sought to question by this action. In view of the delay and want of diligence on the part of the appellants, and the character and great change in the value of the property

in dispute, we must hold that they are precluded by their laches and acquiescence from obtaining the relief they seek. For these reasons we think the judgment of the superior court should be affirmed.

*By the Court.*— The judgment of the superior court is affirmed.