Hamilton vs. Menominee Falls Quarry Co.

HAMILTON, Assignee, Respondent, vs. MENOMINEE FALLS QUARRY COMPANY, imp., Appellant.

.SAME, Respondent, vs. SMITH, Intervener, Appellant.

SAME, Respondent, vs. HERMAN, Intervener, Appellant.

*December 20, 1899 — April 6, 1900.*

*Fraudulent conveyances: Corporations: Insolvency: Laches.*

1. The capital stock of a corporation is not to be reckoned as a liability when determining its solvency as to creditors.

2. As against either existing or subsequent creditors a solvent corporation may dispose of property for an inadequate consideration or by voluntary conveyance, if there is no actual intent to defraud creditors and the corporation is not rendered insolvent by the transaction.

3. So far as the validity of a transfer of corporate property depends on the solvency of the company, it must be considered on the basis of then existing values of property, and not in the light of subsequent changes.

4. Insolvency, in such connection, does not mean an insufficiency of quick assets to pay all debts at once, nor the inability to meet commercial obligations as they fall due in the course of business, but that the property of the corporation, real and personal, estimated at a fair and reasonable valuation, is substantially less than its debts.

Hamilton vs. Menominee Falls Quarry Co.

5. The evidence in this case is *held* to show, contrary to a finding of the trial court, that at the time of a conveyance by a corporation its assets largely exceeded its liabilities and that the transfer did not render it insolvent.

6. In March, 1890, a corporation conveyed a stone quarry to a new corporation having the same stockholders. In December, 1891, the grantor made an assignment for the benefit of creditors. In March, 1892, the grantee of the quarry conveyed it to defendant, also a new corporation but having in part different stockholders. On November 1, 1894, the assignee of the original grantor brought an action to set aside said conveyances on the ground that they were fraudulent and void as to creditors of his assignor, alleging that the assignor was insolvent when it conveyed the quarry and that the conveyance was without consideration. The books and papers of the assignor, showing all the facts relied upon by the plaintiff, had been in his posssession since the assignment, but an examination of them by an expert was not begun until in December, 1892, and no report thereon was made until a year later. Defendant had been in possession of the quarry ever since the conveyance to it, and had spent large sums in improving it and establishing the business, without any suggestion from plaintiff, until the action was commenced, that the title was defective. *Held*, that, even if the delay in the examination of the books was necessary, yet the subsequent delay for nearly a year in bringing the action, while defendant went on investing its money and incurring liabilities, constituted such laches as would bar plaintiff from equitable relief.

APPEALS from orders and a judgment of the circuit court for Racine county: FRANK M. FISH, Circuit Judge. *Orders affirmed; judgment reversed.*

This is an action in equity, brought by the plaintiff, as assignee under a voluntary assignment of the Hadfield Company, an insolvent corporation, against the Menominee Falls Stone Company and the *Menominee Falls Quarry Company*, both of which are corporations, to set aside the conveyance of a stone-quarry property, made by the Hadfield Company to the Menominee Falls Stone Company, as well as a second conveyance of the same property, made by the stone company to the quarry company; both of said conveyances being

alleged to be fraudulent and void as to the creditors of the Hadfield Company.

There were many facts which were undisputed in the case, and such essential facts are, in substance, as follows:

The Hadfield Company was incorporated December 1, 1886, at Waukesha, Wisconsin, by Joseph, Abraham, and George A. Hadfield, who were and remained its sole and equal stockholders and directors. It succeeded to the property and business formerly carried on by the Hadfields in partnership, and had a nominal capital of $200,000, which was paid by the transfer to it of all the partnership property of the Hadfields, then comprising a large and valuable stone quarry at Waukesha, together with the personal property and choses in action. Afterwards, and prior to March, 1890, the Hadfield Company acquired about 150 acres of land, upon which there was another valuable stone quarry, at Menominee Falls, which is the property in litigation here. In order to develop said property, the Hadfields organized a railroad corporation, with a nominal capital stock of $100,000, and built a private railroad, twelve miles long, from the quarry to a station called Granville, upon the St. Paul Railway, and spent more than $100,000 building said road, and mortgaged the property for that sum to pay the construction expenses.

In March, 1890, the Hadfields organized the stone-quarry corporation with an authorized capital stock of $100,000, of which they were and continued to be the sole stockholders and directors, and caused a conveyance of the Menominee Falls land and quarry to be made by the Hadfield Company to this new corporation. No consideration was paid to the Hadfield Company for this property, but the consideration named in the deed was $35,000, of which $14,500 consisted of mortgages on the property assumed by the stone company, and the remaining $20,500 was charged to the Hadfields individually on the books of the Hadfield Company, January

1, 1891, and stock in the new corporation to the amount of $20,500 was issued to the Hadfields.

The Menominee Falls quarry was opened, worked, and improved during the season of 1890, all of its output being billed to and marketed and proceeds received by the Hadfield Company, which also paid the operating expenses, and the books of the Hadfield Company showed a profit made by the stone company January 1, 1891, of $18,007.31, of which $5,000 was expended in buildings and improvements to the quarry and $13,007.31 was credited upon the books of the Hadfield Company to the Hadfields upon their indebtedness for the stock of the stone company. The Hadfield Company had a branch office in Milwaukee, and conducted a lime, stone, and coal business there at a loss until the season of 1890 and 1891, when it went more heavily into the coal business in Milwaukee, and lost large amounts of money therein, amounting to over $120,000 in one season, according to its books. It also conducted its large stone and lime business at Waukesha in the usual manner, in which business there appears always to have been profit.

On the 14th of December, 1891, the Hadfield Company, being then insolvent in a large amount, made a voluntary assignment for the benefit of its creditors to one Townsend, who resigned his trust March 16, 1892, and was succeeded by the plaintiff. The property in litigation was not included in the schedule of assets of the Hadfield Company made under sec. 1697, R. S. 1878, nor was any claim to said property made by the assignee prior to the commencement of this suit, November 1, 1894.

Early in the year 1892 negotiations commenced between Joseph and A. H. Hadfield upon the one side and *Henry Herman, Winfield Smith,* and Samuel Rosendale on the other, for the sale of one half of the property of the Menominee quarries and of the private railroad, which negotiations resulted, February 2, 1892, in a written agreement by which

*Herman, Smith,* and Rosendale agreed to buy one half of all the property or stock of the stone company and of the railway company for $50,000 (subject to the existing debts of. $100,000 upon the railway and $9,500 upon the stone quarry). The Hadfields guaranteed that such property would make a clear profit of $15,000 a year. This agreement was afterwards modified so that a new corporation should be formed with an authorized capital stock of $100,000, of which the two Hadfields were to take one half, and *Herman, Smith,* and Rosendale were to take the other half, and all of the property of the stone company and the railroad company should be transferred to the new corporation. This new corporation was called the *Menominee Falls Quarry Company,* and is the appellant here, and it was incorporated March 5, 1892, pursuant to the agreement. *Herman, Smith,* and Rosendale paid $50,000 in cash into the treasury of the new corporation, and Joseph and A. H. Hadfield each gave a check for $25,000. All of the property of the stone company and the railway company was transferred to the quarry company, and the Hadfields took the money paid in, as well as their own checks, they being then the sole stockholders of the stone company and the railway company. The Hadfields became directors of the new corporation with *Herman, Smith,* and Rosendale, and the new corporation took possession of the Menominee Falls quarry and the railroad, and operated them from that time until November 1, 1894, when this action was commenced.

The court did not find that the Hadfield Company conveyed the Menominee Falls quarry to the stone company in March, 1890, with intent to defraud its creditors, either present or prospective, but did find that on the 26th of March, 1890, the liabilities of the Hadfield Company, including its liability upon stock to its stockholders, exceeded its available assets by over $250,000, and that it was then hopelessly insolvent; that said transfer to the stone company was in

fact a transfer of corporate property, without consideration, by directors to themselves, made while the company was insolvent, and hence was void as to creditors of the Hadfield Company; that certain of the present creditors were such on the 26th of March, 1890, and that present creditors to the amount of $127,000 are creditors whose property was sold by the Hadfield Company, and the proceeds used to pay debts of the Hadfield Company which existed March 26, 1890; that the quarry company was not an innocent purchaser for value of the property in litigation, for the reason that the Hadfields, who became directors of the quarry company, had actual knowledge of all the facts, and because *Herman, Smith,* and Rosendale had knowledge of such facts as should have put them upon inquiry, which inquiry, if made, would have resulted in their learning the actual facts; that both transfers were void as to the plaintiff and the creditors of the Hadfield Company, and that the plaintiff was entitled to an accounting with both the stone company and the quarry company for all profits received from the property and business.

After the filing of the trial judge's opinion, but before the formal findings were signed, both *Smith* and *Herman* made separate applications to be interpleaded as defendants in the action, for the purpose of protecting their individual rights, claiming to have made large advances to the quarry company, and that they were entitled to be protected as creditors of the quarry company in the judgment. These applications were denied, and an interlocutory judgment entered, holding the transfers void and ordering an accounting pursuant to the findings.

From this judgment the quarry company appeals; and *Smith* and *Herman* appeal separately from the orders denying their petitions for intervention.

For the appellant *Menominee Falls Quarry Company* there was a brief by *Samuel Rosendale* and *Chas. Quarles*, of coun-

sel, and also a brief by *Charles E. Monroe*, of counsel; for the other appellants there was a brief by *Mr. Quarles*; and the cause was argued orally by *Mr. Quarles* and *Mr. Rosendale*.

For the respondent there were briefs by *Winkler, Flanders, Smith, Bottum & Vilas*, attorneys, and *Van Dyke & Van Dyke & Carter*, of counsel, and oral argument by *James G. Flanders* and *W. D. Van Dyke*.

The following opinion was filed February 2, 1900:

WINSLOW, J. As will be seen from the foregoing statement of facts, the trial court did not find actual fraudulent intent on the part of the Hadfields or the Hadfield Company to defraud either existing or prospective creditors of the company in conveying the Menominee quarries to the stone company, although such intent to defraud was charged ·in the complaint, but the court found in effect that the Hadfield Company was hopelessly insolvent in March, 1890, when the transfer was made; that the transfer was a transfer without consideration by directors of an insolvent corporation to themselves, and was hence void as matter of law as to the plaintiff and all creditors of the Hadfield Company; and that the quarry company took the property with notice, both actual and constructive, of the facts constituting the fraud; and hence that both of the conveyances attacked should be set aside. These are the facts, then, upon which the judgment is to be sustained, if sustained at all, namely: that the Hadfield Company was insolvent; that the directors conveyed corporate property to themselves without consideration; and that the quarry company took the property charged with knowledge of the facts.

As to the first and foundation fact, upon which the whole fabric depends, namely, the insolvency of the Hadfield Company when the deed was made, the finding is that the liabilities of the company, *including its capital stock*, exceeded

its available assets by over $250,000, and it was then hope-lessly insolvent. The first noticeable element in the finding is that the stock liability is reckoned as a liability to be considered when determining solvency as to creditors. If this be a liability which must be considered in determining corporate solvency in the business world, then it is probable that there are very many insolvent corporations. Let any business man financially interested in corporations stop a moment, and figure up their liabilities one by one, reckoning in the liabilities to stockholders for stock issued, and then reckon up their readily convertible assets, and how many will he find that can be said to be solvent under this rule? Not many, we think. And again, what does "*available*" assets mean? The word available must have been inserted for some limiting or qualifying purpose. It must have been intended as including certain assets and excluding others, else there was no reason for its use. The ordinary meaning of "available" is "usable, capable of being used to advantage;" and we suppose when the word qualifies assets, as here, it must mean property that can be sold or turned into cash with which to pay debts within a reasonable time. So the inevitable inference from the finding is that, if a corporation has not enough assets which can be used within a reasonable time to pay its creditors and its stockholders in full, it is insolvent.

We find ourselves unable to subscribe to this idea. It is true that in the final winding up of the affairs of a corporation, after all creditors are paid (and not until then), the stockholders are entitled to come in and receive payment for their stock. But such rights do not interfere in the least with the claims of true corporate creditors; so that, as far as such creditors are concerned, the ability of the corporation to respond to its stockholders upon stock liability is of no moment. As to creditors the question simply is, Has the corporation ample property to pay them? not, Has it

property sufficient to pay off every stockholder after pay-
ment of its debts to creditors? It is also true that stock-
holders of a corporation may, by action, prevent the direct-
ors from wasting or squandering the capital or assets of the
corporation, and may compel restitution of squandered prop-
erty to the corporation, because the corporate property is
the property of the stockholders (subject to the payment of
debts), and the directors are their trustees in the manage-
ment thereof, and have no right to squander or give it away
when a stockholder objects. No such question arises here,
however, because the transfer here attacked was made with
the consent and approval of every stockholder, and they
could not be heard to complain thereof, and in fact are not
complaining. It is now settled in this state, as the result
of a series of decisions, that the directors of a going corpo-
ration are in no sense trustees for the corporate creditors in
the management of the corporate business, even though the
corporation be insolvent; and that it is only when the cor-
poration ceases to be a going concern, or the situation is
such that its directors know, or ought to know, that suspen-
sion is impending, that its assets become a trust fund, so
that directors may not prefer themselves over general cred-
itors (*Hinz v. Van Dusen*, 95 Wis. 503); and, further, that
when the corporation is solvent, and there is no actual in-
tent to defraud creditors, it may dispose of property for an
inadequate consideration or by voluntary conveyance as an
individual may do, and subsequent creditors cannot question
the transaction (*Shoemaker v. Washburn L. Co.* 97 Wis. 585;
*Graham v. Railroad Co.* 102 U. S. 148). This last proposi-
tion is founded upon very plain principles of justice and
reason. A simple creditor has no interest in or lien upon
the corporate property. If, after a corporation has con-
veyed a part of its property with no fraudulent intent, but
for an inadequate consideration, there still remains ample
corporate property to pay debts, then no existing creditor

Hamilton vs. Menominee Falls Quarry Co.

can complain, for he has not been damnified. And if this is true as to present existing creditors, it is necessarily and more clearly true as to subsequent creditors who have not relied upon the conveyed property for security or contracted with reference thereto.

The court below found upon sufficient evidence that a part of the present creditors of the Hadfield Company were creditors whose claims existed on the 26th day of March, 1890; hence the question as to the validity of the transfer made on that date must be considered with reference to the rights of creditors then existing. But it is important to observe that, so far as the validity of the transfer depends on the solvency of the company, it must be considered on the basis of the values of property as then fairly estimated and considered; that is, in the light of then existing values, and not in the light of the terrible drop in values which took place after the great financial depression of 1893.

It is entirely apparent from the testimony that the Hadfields considered themselves in excellent financial condition in March, 1890. They certainly owned much property and had a good business. The testimony shows that the business had been begun by them in a small way in 1871, with a small quarry and a small capital, and that it had been rapidly developed, new quarry lands being purchased, railroad switches being laid into the quarries, and the business extended, until soon after the year 1880 it had become a business of very large proportions, making profits of from $10,000 to $15,000 a year. In the year 1890 the Hadfield Company employed 100 men in their stone quarry and business. They operated a store at Waukesha, where many of the men bought their supplies, and made a profit estimated at $2,500 per year therefrom. They had laid out large additions to the village of Waukesha, and built houses thereon, many of which they rented, and they were receiving nearly $4,000 per year from such rentals. They had also accumu-

lated valuable real estate in Milwaukee, and in other parts.
of Wisconsin, as well as in Illinois, and they had acquired
the Menominee Falls quarry property, in litigation here,.
which was potentially valuable, but was still largely unde-
veloped, but ready for immediate development by means of
the private railroad which the Hadfields had then constructed
by means of bonds covering the road. It is true they were
largely indebted at this time and had suffered serious losses
in the Milwaukee business, but these facts are not unusual
in the conduct of such enterprises; in fact, it would be un-
usual if they were not heavy borrowers and had not suffered
some losses. There is no evidence that we have been able
to find in the record which tends to show that they had rea-
son to contemplate, or did contemplate, anything like seri-
ous disaster in the future, or that they thought for a moment
that it was necessary or advisable to secrete or transfer
property to avoid payment of debts.

This being the situation, they organized a new corpora-
tion (the Menominee Falls Stone Company) for the operation
of the Menominee quarries, and transferred those quarries to
it for the expressed consideration of $35,000, and placed the
deed immediately upon record. The Hadfields claim that the
consideration named in the deed was the total amount which
the property had cost them up to that time, but the court.
found that the property had then cost them about $80,000,.
and we accept the finding as conclusive. No money was:
paid to the Hadfield Company upon this purchase, but mort-
gages of $14,500 upon the property were assumed by the
new company, and, upon the 1st of January following, the
Hadfields personally were charged on the books of the Had-
field Company with $20,500, being the balance of such pur-
chase price. Now, they had a perfect right to transfer this
property to the new corporation upon credit and for an in-
adequate price, so far as the Hadfield Company and its stock-
holders were concerned, because all the stockholders of the

Hadfield Company concurred in the transfer and all consented to the transfer and received the benefit thereof. They had also a right, as against existing or future creditors, to make such a transfer, if made without fraudulent intent, and if, without such property, the Hadfield Company still retained enough property, at reasonable current values, to discharge its debts; and this is the crucial question of fact in the case, and requires an examination of the evidence upon the point.

Eliminating the stock liability, the court's finding was that the available property of the Hadfield Company on March 26, 1890 (excluding the Menominee quarry), was $50,000 less than its liabilities, and that it was thereby hopelessly insolvent. If this finding be correct, then existing creditors at least would probably have a right to complain of the conveyance; otherwise not. The finding was evidently based upon the investigations and conclusions of an expert accountant, who labored upon the books, vouchers, and papers and memoranda of the Hadfield Company in the hands of the assignee for more than a year consecutively, beginning in December, 1892, and at various times during succeeding years for considerable periods of time up to the time of the trial of this action, which began in February, 1897. As a result of this examination, the expert first testified that the assets of the company March 26, 1890, amounted to $265,883.22, and its liabilities, excluding stock liability, were $385,022.22, leaving a deficit of about $120,000. In the estimate of assets the entire real estate of the company (excluding the Menominee quarries) was placed at $109,231.16, which amount was arrived at simply by compiling the net cost to the company of its real estate as shown on its books. Subsequently, during the trial, after the introduction of evidence as to the values of the various parcels of real estate on both sides, the plaintiff voluntarily added to the real estate item the sum of $25,827.39, and to the personal prop-

erty items $354.62, making a total of admitted assets of $292,065.24; and also struck out liabilities amounting to $2,379.87, thus leaving an excess of liabilities over assets of about $90,000. On the other hand, the defendants claimed, basing such claim upon cross-examination of the expert and upon oral testimony of witnesses, that the amount of assets as originally fixed by the expert should be increased in the sum of $450,983.69, and that the liabilities should be decreased in the sum of $56,944.56, making totals as follows: Assets, $607,635.76, and liabilities $328,077.66, and a surplus of assets over liabilities of $279,558.10. It will be seen that the difference in the respective claims is very great. The trial court found the excess of liabilities over "available" assets to be $50,000, but the findings do not show whether this reduction of the amount of deficit claimed by the expert was based upon too low an estimate by him of assets or upon too great an estimate of liabilities. In any event, it is plain that the court did not accept as entirely correct the figures of the expert.

The largest single item among the items of increase of assets claimed by the defendants is in the valuation of the Waukesha stone quarries, which the defendants claim should be placed at $225,000, instead of at $65,500, as listed by the plaintiff in its corrected figures. If the defendants' contention on this item is correct, or substantially correct, or if the quarries were worth any sum exceeding $155,000, then, even conceding the liabilities (excluding stock liability) to be as great as plaintiff claims, there was no deficiency of assets when the conveyance attacked was made. But here arises the difficulty as to the meaning of the term "available" assets. If by that term is meant assets which can be readily turned into money—such as open accounts, notes, bills, mortgages, and choses in action, as defined in *Brigham v. Tillinghast*, 13 N. Y. 216,—then the finding is entirely inadequate as a finding of insolvency, in the sense in which

the word "insolvency" is here used. If "available" assets include real estate at a price it would bring at an immediate and forced sale, the finding is equally inadequate for the plaintiff's purposes. Insolvency, as the word is here used, does not mean an insufficiency of quick assets to pay all debts at once, nor the inability to meet commercial obligations as they fall due in the course of business, but it means that the property of the debtor, real and personal, estimated at a fair and reasonable valuation, is substantially less than his debts.

As to this fact the court has not found, nor do we think that it could find under the evidence, that such a condition of affairs existed in March, 1890. The testimony is very voluminous, and the various items very numerous, and we cannot undertake to review them in detail here; but concerning the one item of the value of the Waukesha quarries the testimony may be briefly considered.

The great differences of opinion which always exist among witnesses as to the values of real estate are well understood by the profession. Perhaps no question of fact is more difficult of accurate solution. Particularly must this be the case when considering a large manufacturing or mining plant, the value of which depends so largely upon the condition of the concern which is operating it, whether the business is well established and has a flourishing trade, or whether it is new in the field and has yet to acquire its hold in the business world; in other words, upon the condition of the good will. Many other circumstances enter into the question of the reasonable value of such property which will readily suggest themselves to the mind.

. In the present case there was a large tract of real estate, amounting to more than 160 acres, containing a large and well-developed quarry of excellent building stone, owned by parties who had developed a large and exceedingly profitable business and were still operating it with apparent suc-

cess.   It was within easy reach of great building centers, such as Chicago and Milwaukee, fully equipped with all necessary machinery for its operation, with railway switch tracks running into it.   It also produced excellent lime, and was fully equipped with twelve or fourteen kilns for the production of lime, and had an excellent business established in this commodity; and it is not claimed that the quarry was approaching exhaustion either in building stone or lime stone.   Bearing these facts in mind, we come to the expert evidence, and find that the plaintiff called four witnesses upon the question of value, two of whom placed the value at from $50,000 to $60,000, one at $60,000 to $70,000, and one at $75,000. The plaintiff himself testified that he thought it worth $75,000 to $80,000; that in the fall of 1892 he received an offer of $92,000, but that the terms were not arranged, and that he made strenuous efforts to sell it, fixing the price in some instances at $100,000, but had not succeeded in selling.  It is not strange that during the universal depression in business which prevailed from the spring of 1893 up to the time of the trial of this action the assignee has not succeeded in selling such a large property.  On the other hand, the defendants produced four witnesses whose means of knowledge seem fully equal to those possessed by plaintiff's witnesses, one of whom placed the value at $200,000 and the others at $225,000.    The first of these witnesses was a man engaged in the lime and stone-quarrying business, who, after examination, made the Hadfields an offer of $200,000 in the spring of 1890 for the property, which was rejected by them as insufficient. In addition to this testimony, A. H. Hadfield testified that in his opinion the property was then worth $250,000, and *Mr. Herman* (the intervener, appellant here) testifies that in or about the year 1889 he made a proposition to Mr. A. H. Hadfield on behalf of other parties to purchase the property for $225,000.

As we do not know at what figure the court placed the

Hamilton vs. Menominee Falls Quarry Co.

value of this property, or in fact whether it was considered an available asset at all, except by inference, we are at liberty to consider the question upon the weight of the evidence upon the subject, and we are entirely satisfied that it would not and does not sustain the conclusion that its reasonable value in March, 1890, was but $65,500; nor do we think any fair or just consideration of that evidence would allow the fixing of its value, in consideration of its demonstrated earning capacity, at anything less than $150,000. We cannot undertake to review all the evidence upon the subject, nor state in detail all the considerations which force our minds to this conclusion, but it must be sufficient to say that, after careful review of the testimony, we can reach no other result. This result adds at least $85,000 to the sum of the Hadfield Company's assets in March, 1890, and practically wipes out the deficiency of assets claimed by the plaintiff's expert.

There are other items of assets which the evidence clearly demonstrates ought to be increased in amount above the expert's statement, as well as items of indebtedness which ought to be stricken therefrom, but it would extend this opinion to an unwarrantable length were we to attempt to review them in detail. Suffice it to say that, in our judgment, the reasonable value of all the assets at the time of the transfer attacked is shown clearly by the evidence to have exceeded the liabilities, not by a mere beggarly margin, but in an amount running up well into the thousands, and that the transfer did not render the company insolvent in the sense in which that word must here be used.

There being no actual fraudulent intent, and the company being solvent, and not rendered insolvent by the transfer, there is no ground upon which the transfer can be set aside as to existing creditors, and for stronger reasons it cannot be set aside as to subsequent creditors. The subsequent heavy losses and consequent hopeless insolvency of the com-

pany, whether resulting from imprudent management or reckless business adventures, cannot affect the question. These are chances which every man who extends credit to another or to a corporation must always take, and must submit to the result as philosophically as he may.

This conclusion effectually disposes of the plaintiff's claim, but there is another consideration which reaches the same result and which we shall briefly state. The sale of the Menominee quarry to the present defendant was made in March, 1892, and *Herman, Smith,* and Rosendale then invested $50,000 in the purchase. No claim was then made by any one that there was any defect in the title. The defendant corporation immediately went into possession and active operation of the quarry, and continued to operate it without let or hindrance, or even claim by the plaintiff that the title would be attacked, until the commencement of this action, November 1, 1894,— a period of nearly three years. During this time the evidence shows that nearly or quite $40,000 has been spent in improving the property and establishing the business. During this time, also, all the books and papers and other means of information upon which the plaintiff now relies were in his possession, or in the possession of his predecessor. It will not do to say that the facts could not be discovered earlier. The expert testifies that he began his examination in December, 1892. This was surely a long delay, when we consider that the plaintiff claims that *Herman, Smith,* and Rosendale should have known of the fraud in March, 1892, when they purchased. But waiving this point, we find that the expert spent a year making his first examination, and made his first report in December, 1893. This seems to have been a very long time, when the facts all appeared upon the books and papers; but, conceding this delay to have been necessary, still the action was delayed for another year, and in the meantime the defendant was allowed to go on investing its money and

incurring liabilities without suggestion of a fatal defect in its title. We cannot but regard this delay as constituting laches which, within well-known rules, will bar the plaintiff. from now invoking the aid of a court of equity. *Rogers v. Van Nortwick,* 87 Wis. 414.

The conclusions reached in the main case render unnecessary any consideration of the appeal from the orders refusing to *Smith* and *Herman* the right of intervention.

*By the Court.*— Judgment reversed, and action remanded with directions to render judgment for the defendant. The orders appealed from are affirmed.

The respondent moved for a rehearing in the case of *Hamilton v. Menominee Falls Quarry Company.*

For the motion there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* attorneys, and *Van Dyke & Van Dyke & Carter,* of counsel, and a separate brief signed by *Van Dyke & Van Dyke & Carter,* of counsel.

In opposition there were separate briefs by *Quarles, Spence & Quarles,* of counsel, and *Sam'l Rosendale,* attorney.

The motion was denied April 6, 1900.