BROWN, Appellant, vs. GRISWOLD and wife, Respondents.

*February 4 — February 26, 1901.*

*Agency: Sale of land: Oral authority to make written contract: Appeal: Defective findings: Directing judgment: Specific performance: Form of judgment.*

1. Oral authority is sufficient to empower an agent to make a written contract for the sale of land.

2. In an action to enforce specific performance of a written contract for the sale of land, made by an agent who had only oral authority, the only disputed question of fact was whether the agent had been given authority to sell or only to find a customer. The first seventeen findings of the court were mere recitals of the testimony and correspondence of the defendant and the agent. The eighteenth finding was that the agent had not been authorized by defendant to execute the contract sought to be enforced. A question largely debated before the trial court was whether oral authority could suffice to empower the agent to make a written contract for the sale of land. The evidence preponderated in favor of the view that the agent had been given authority to sell. *Held,* that said eighteenth finding, being ambiguous, would be construed merely as a conclusion that oral authority to sell land was not authority to execute a binding contract for its sale, and not as a finding that the agent had not been given authority to sell.

3. In an action tried by the court, where there is no finding upon the only controverted question of fact, but there is no doubt where the true preponderance of the evidence is, and no gain can reasonably be expected from another trial, the supreme court, on reversing the judgment, will direct the entry of such judgment as the trial court should have rendered upon the evidence.

4. After the commencement of an action to compel specific performance of a contract for the sale of land, the defendants disabled themselves from making an effective conveyance by conveying the land to a purchaser upon whom the notice of *lis pendens* had been served. *Held,* that a decree in plaintiff's favor should be such that of its own force it will transfer to him all of the title which the defendants had at the time of the commencement of the suit, whether now vested in them or in some person claiming under them subsequent to that date.

APPEAL from a judgment of the circuit court for Grant county: GEORGE CLEMENTSON, Circuit Judge. *Reversed.*

Brown vs. Griswold and wife.

The defendant, being the owner of a tract of real estate in the city of Platteville, fronting north on Main street about 210 feet, and extending southward about 360 feet, through the block to another street, made a verbal arrangement with Thomas L. Cleary, a lawyer, either to make sale thereof or to find customers therefor. After several years, characterized by much correspondence, and during which the south half of the premises had been sold by said Cleary, the latter, on June 2, 1896, closed a sale of the remainder to *Brown* at the price of $3,500, payable upon delivery of the deed, and gave to him an acknowledgment of payment of $100 thereof, reciting the terms of the agreement of sale, and signed the same, " *O. F. Griswold*, by T. L. Cleary, Agent." Defendant repudiated the sale, and on the day after this suit was commenced and *lis pendens* filed conveyed the premises by warranty deed to one McCoy, on whom had been served a copy of the notice of *lis pendens* the day before the filing of complaint and *lis pendens*. This action being brought to require specific performance, and being tried by the court, judgment was rendered dismissing the complaint, from which the plaintiff appeals. Further detail of facts will appear in the opinion.

For the appellant there was a brief by *Orton & Osborn*, and oral argument by *C. F. Osborn*. As to the power of agents to make contracts for the sale of real estate of their principal, they cited *Lyon v. Pollock*, 99 U. S. 668; *Johnson v. Dodge*, 17 Ill. 433; *Peabody v. Hoard*, 46 Ill. 242; *Cossitt v. Hobbs*, 56 Ill. 231; *Proudfit v. Wightman*, 78 Ill. 553; *Hemstreet v. Burdick*, 90 Ill. 444; Rapalje, Real Estate Brokers, 49; Fitch, Real Estate Agency, 34, 35; *Vandana's Heirs v. Hopkins' Adm'r*, 19 Am. Dec. 92; *Smith v. Allen*, 86 Mo. 178; *Glass v. Rowe*, 103 Mo. 535; *Minor v. Willoughby*, 3 Minn. 225; *Groff v. Ramsey*, 19 Minn. 44; *Jackson v. Badger*, 35 Minn. 52; *Holden v. Starks*, 159 Mass. 503; *Stadleman v. Fitzgerald*, 14 Neb. 290; *Hopwood v. Corbin*, 63 Iowa, 218;

*Pringle v. Spaulding,* 53 Barb. 17; *Haydock v. Stow,* 40 N. Y. 363, and cases cited; *Davidson v. Van Pelt,* 15 Wis. 342; *Taft v. Kessel,* 16 Wis. 274; *Davis v. Henderson,* 17 Wis. 106; *Seaman v. Ascherman,* 57 Wis. 555; Pomeroy, Contracts, 115, 116, and note; Story, Agency (9th ed.), § 50; 1 Am. & Eng. Ency. of Law (2d ed.), 1012; 1 Warvelle, Vendors, 211, and note.

For the respondents there was a brief by *Lowry & Clementson,* and oral argument by *George B. Clementson.* To the proposition that a general authority to sell real estate includes merely the power to find a purchaser, and that the agent cannot conclude a contract that will be binding upon his principal, they cited *Grant v. Ade,* 85 Cal. 418, 20 Am. St. Rep. 237; *Prentiss v. Nelson,* 69 Minn. 496; *Duffy v. Hobson,* 40 Cal. 240, 6 Am. Rep. 617; *Walker v. Osgood,* 93 Am. Dec. 172, note; *Treat v. De Celis,* 41 Cal. 202; *Armstrong v. Lowe,* 76 Cal. 616.

DODGE, J. There is but one debatable question in this case, and that is whether the defendant *Griswold's* arrangement with T. L. Cleary was merely an authority to seek and produce customers for the defendant's property, or whether, as between themselves, it was contemplated and agreed that Mr. Cleary was to sell the property at prices named and bind *Mr. Griswold* to such sale. This depends upon what was the conversation which the parties confessedly had at about the time the defendant left Platteville, in 1892, as to which different versions are given by Mr. Cleary and by the defendant in their testimony. This conversation, in which the agreement, whatever it was, was made, was followed by several years of correspondence and other transactions, all referring back to that original arrangement, and they are relevant and material merely as declarations and conduct evidentiary, and by way of practical construction, of the agreement into which Cleary and *Griswold* had already en-

tered. This being the issue, a direct and unambiguous find-
ing of the trial court thereon would be of very much weight,
and, unless the preponderance of evidence to the contrary
of such finding was entirely clear, we should deem ourselves
controlled thereby. On turning to the so-called findings, we
find a document which it is confidently believed is without
precedent. It consists of some thirteen printed pages, recit-
ing a large share, but not all, of the evidence in detail. It
finds that *Mr. Griswold* gave in testimony certain quoted
words, and wrote certain quoted letters, and the same as to
Cleary and as to the plaintiff. Indeed, the first seventeen
of the so-called findings of fact are but little more than a
repetition of information which ordinarily is derived, and
in this case could have been derived, from the bill of excep-
tions, at least so far as the findings have any reference to the
single disputed issue. The so-called findings of fact con-
clude with the eighteenth: "I further find that Mr. Cleary
had not been authorized by *Mr. Griswold* to execute the
contract of June 2, 1896, set forth in finding 10, and that
the latter did not ratify said contract, but refused to do so."
Then follows the single conclusion of law that the plaintiff
is not entitled to the relief demanded and defendants are
entitled to have the complaint dismissed upon the merits.

This eighteenth finding is ambiguous. It does not declare
the conclusion of the trial judge either way upon the real
litigated issue, namely, whether *Griswold's* authority to
Cleary was to close sales and commit him to them, or was
only to present customers for his acceptance or rejection.
The natural construction of the words used in the eighteenth
finding would indicate no more than a decision either of
the question of fact whether *Griswold* expressly authorized
Cleary to execute the specific written contract, or a question
of law whether authority so to do resulted from the transac-
tions between them. It was stated upon the argument, with-
out dissent, that a question largely debated before the trial

Brown vs. Griswold and wife.

court was whether oral authority could suffice to empower an agent to make a written contract for the sale of lands. That question was not discussed by the respondent in this court, and the law thereon in this state in favor of such power seems to be well settled in *Dodge v. Hopkins*, 14 Wis. 630; *Smith v. Armstrong*, 24 Wis. 446; and *Tufts v. Brace*, 103 Wis. 341, 344. In this situation we are left in much doubt whether the record discloses any conclusion of fact by the trial court upon the material issue, or merely upon one which the court believed to be material, but which, under the authorities, is not so. A careful examination of all the evidence leaves no doubt that, as an original proposition, it preponderates in favor of Mr. Cleary's version of the contract, as will appear by a fuller discussion thereof hereafter; and, while we are not prepared to declare that its preponderance is so clear and overwhelming that we would set aside an unambiguous finding of the trial court to the contrary, the fact that it does preponderate against this eighteenth finding, if it be construed as respondent would have it, is a very cogent one in guiding us to a conclusion as to the meaning of that finding. We should be slow to believe that the court meant to decide that the parties did not have an intention which their conduct and correspondence have so clearly evinced. Again, if the court intended by this last finding to decide what were the terms of the agreement or arrangement between Cleary and *Griswold*, we are unable to conceive any purpose to be accomplished by devoting many pages to setting forth the words of their testimony and correspondence. Such instrument strongly suggests confirmation of what was asserted upon the argument, that the eighteenth finding merely declared the court's conclusion that, although the arrangement had been that Mr. Cleary should make and close a sale on behalf of his principal if he had an opportunity at the price fixed, such arrangement did not constitute an authority to

execute the written instrument on which the plaintiff relied. All these considerations constrain us to the view that such is the true meaning and construction of the eighteenth finding, and that the case comes to us with no finding by the court below upon the disputed question of fact on the resolution of which the rights of the parties must depend.

Being thus without such finding, three courses are open to us on appeal. If the evidence clearly supports the judgment, we should affirm it. *Jones v. Jones,* 71 Wis. 520; *Raipe v. Gorrell,* 105 Wis. 636. Failing this, if the question is in doubt and uncertain, so that a decision here might work injustice, we should reverse and remand for further trial. *Kemp v. Seely,* 47 Wis. 687; *Cramer v. Hanaford,* 53 Wis. 85, 88; *Hill v. Am. S. Co.* 107 Wis. 19, 28, 34. But if an examination of the evidence discloses with reasonable certainty a preponderance in favor of the plaintiff's contention, it is our duty to direct judgment in accordance therewith. *Maldaner v. Smith,* 102 Wis. 30, 41; *Hamilton v. Menominee Falls Q. Co.* 106 Wis. 352; *Hill v. Am. S. Co., supra.* We proceed, therefore, to an examination of the evidence.

Mr. Cleary's testimony as to the only interview in which authority was given is as follows: "He told me to sell it if I could, and gave me the prices upon the property. The price on the back lot that McBride bought was $1,500, and upon the front lot upon which his (*Griswold's*) house stood it was $3,500. My commission was to be $50 on the back lot, and $100 on the front one." The respondent's version was substantially as follows: "I asked him what he would charge me to find a customer for me, in case I concluded to sell it, and I fixed my price at $5,000. To my question he replied that he would charge me $25. I says, 'That's reasonable, Tom.' And I says, 'If you succeed in finding some one that will pay my price, I think probably I will be willing to pay a little more.' . . . In any case, he was to

Brown vs. Griswold and wife.

correspond with me and receive instructions from me in regard to either selling or renting; and when I left — a few days before I left — I said to him, 'If you hear of any one that wants to buy, just let me know.'" These conversations shortly preceded respondent's departure from Platteville, which took place about August 1, 1892. The first letter which Mr. Cleary writes was August 23, 1892. It commences, "Dear Friend: No sale made as yet;" then goes on with some information about renting, sales of other property in the vicinity, and possibility of subdivision of the premises. This was followed by a further letter discussing the subject of renting and terms thereof. To the two letters reply was made by defendant on September 2d, discussing merely the subject of renting, repairs, etc. The following spring, March 30, 1893, Mr. Cleary writes: "There are now again inquiries for real estate in this city. Mort Eastman and Max Sickle have inquired as to prices on your property. I do not like to give them terms now before consulting you again. It is now some time since I heard from you, and since that time you may have changed your mind." It recites his remembrance of the prices, and says: "Now, if those terms are to stand, let me know at once. Of course, *you said I might*, if I remember correctly, *sell* the back lot for some less, but I have now forgotten the exact figures, and I wish you to repeat instructions." To that, April 2d, respondent replies: "I am still disposed, for a time at least, to stick to my original figures. . . . Do the best you can to secure my figures,"— and suggests possible modifications in price. Nothing appears to have been accomplished during that year until January 12, 1894, when Mr. Cleary writes: "I have occasionally been asked whether you still wished to sell those back lots. I think Morton Eastman is nearly ready to buy them if you wish to sell them. I have told him all the time the price was $1,500 for your back lot. I didn't want to make a *bargain* with

him now, until I heard from you again, because you might have changed your mind since I heard from you last. Perhaps you intend to come back again to live here. I hope you do." To that *Griswold* replied, January 19th, "Will say, in regard to my back lot, that it is still for sale and that my price still remains the same, $1,500; " and closes, after suggesting certain changes in line and offering to sell the front lot at $3,500, with the words, " Hope you will be able to *make a sale.*" Then follows a letter from Cleary of March 14, 1894, indicating difficulty in getting $1,500 for the back lot, and probability of $1,400; and on March 16th *Griswold* writes, hoping to get the $1,500, but says: "I would like you to use your own judgment in the matter, keeping in mind my best interests. While I am rather inclined to think from the tone of your letter that he can be induced to pay $1,500, if you think otherwise you may offer it to him for $1,450. And if, in your opinion, $1,400 is most he will pay for it, let her slide at that. . . . At whatever price back lot is sold, it must not measure longer in depth (north and south) than front lot. . . . I hope that you will be able to make a sale to McBride, as he will probably build a pretty good house." On March 22d Cleary writes: "Dear Friend: *I sold the back lot* to-day to John McBride for $1,400.00. It was the best that I could do. . . . I made a written contract with him, a copy of which I herewith inclose you." To this letter no reply was made, but on March 29th Cleary sent deed in fulfilment of the contract of sale, which the defendant promptly executed, and returned with instructions to deliver in accordance with the written agreement of sale, which, by the way, was signed by the purchaser, McBride, and by " *O. F. Griswold,* by T. L. Cleary, Agent." In remitting the proceeds, Cleary deducted $50 for his commission, together with certain other expenses, and defendant responded that he saw nothing in the deductions to object to.

Thereafter, through the years 1894 and 1895, more or less correspondence took place between the parties, consisting mainly of discussion of prices and possible customers, all at less than the $3,500 which had been named as the selling price, and indicating a mutual understanding between the parties that the latter was a pretty high figure, and that possibly less than that might be accepted. The only letter of much significance is one of May 16, 1895, after Cleary was already in negotiation with the plaintiff, of which he had written defendant, who replied with reference to some negotiation he himself was having with one McCoy. He says: "I write him to-day that a short time ago *you had an out-of-town* customer for it on the string, and that before making him (McCoy) a price I would like to hear from you. I suppose that *your customer*, Mr. B., does not want it at the price made him; but I would like to hear from you first, anyway. Please favor me with a reply as soon as possible, and give me an idea of about the best price you can get out of your man." The last letter passing between Cleary and defendant was on October 21, 1895, having reference to the possibility of subdividing the tract so as to get the $3,500 out of it, but in no wise indicating a withdrawal of that as the price of the whole. In May, 1896, plaintiff, *Brown*, wrote direct to *Griswold*, explaining that Mr. Cleary had been absent for a few days, and offering $3,250 for the property. To this defendant replied on May 25th, declaring $3,500 to still be defendant's price for the property. This letter was shown to Cleary, as he thinks, before the closing of the sale with *Brown*. On June 2d *Brown* came to Cleary, and accepted the price which had been made to him by Cleary and confirmed by this letter from defendant; whereupon Cleary drew up a written memorandum of the agreement, and acknowledgment of the payment of $100 earnest money, the remainder to be paid upon delivery of deed, and signed it in the name of *Griswold*. He telegraphed defend-

Brown vs. Griswold and wife.

ant of the sale, adding the words, "Wire answer whether all right," and at the same time wrote a letter in which he explained that inquiry as due to the fact that the sale to *Brown* was dependent on whether a sale to any one else had been previously closed by the defendant direct. Defendant responded by telegram, "Sale to *Brown* all right, if there are no commissions and abstract not required." Correspondence followed, in which Cleary insisted that the sale was at $3,500, to be paid by *Brown,* and the question of commissions was between himself and the defendant; whereupon defendant sought to repudiate the authority, and, after suit was commenced, made a sale to one McCoy, the deed being signed by *Griswold* and wife, for $3,600, McCoy having full knowledge of plaintiff's claims and commencement of suit, and promising the defendant to protect him against any liability thereon.

As we have stated before, the question is, What was the arrangement originally made between Cleary and the defendant? for there is nothing in the correspondence to modify or change that, except, perhaps, as to price. A significant thing is that the earliest correspondence following that arrangement assumes authority in Cleary to make a sale. His very first letter takes occasion to inform defendant that no sale is yet made,— an utterly meaningless remark, if, as defendant claims, he was only to submit customers. Cleary's view is confirmed by frequent remarks in defendant's letters indicating his understanding that Cleary was to make a sale, and most cogent of all is the fact that Cleary, a lawyer of standing and reputation, obviously devoted to the interest of his friend and neighbor, the defendant, at the first opportunity to obtain the price which defendant had named, considered himself authorized to make a binding written agreement of sale, and to that understanding defendant gave assent in everything except direct words. He approved, he executed deed, acknowledged his duty to make title and fur-

nish abstract as that writing provided, and also passed, not only without dissent, but with approval, the charge of $50 commission, which, according to Cleary's testimony, was stipulated in advance, but which is wholly inconsistent with defendant's narrative of the original conversation. This is enough of itself to fully establish the correctness of Cleary's version of their arrangement as against that of the defendant himself, without placing weight upon the fact that Cleary is a disinterested witness between the parties. There is nothing in the subsequent correspondence to modify this conclusion in the least, and many remarks tending to confirm it. There is nothing to indicate any raising of the price, and, indeed, the letter to *Brown* only a week before the sale was made establishes that the defendant considered $3,500 as still the price, the same having theretofore been fixed by him and stated to plaintiff by Cleary. Upon the correspondence subsequent to the sale which is now attempted to be repudiated we place very little weight. The controversy had then arisen, and declarations then made by the defendant in his own favor are not receivable in evidence, or, if received, are not entitled to weight. Suffice it to say that throughout that subsequent correspondence Cleary insisted firmly on the correctness of his version of his authority, as afterwards testified to by him.

This is the whole controversy. The only two witnesses to the transaction have testified in full. The entire correspondence is before us. We have not the slightest doubt where the true preponderance of evidence is, and can see no reason to expect that anything could be gained by further trial or investigation of this mooted question. It therefore becomes our duty to reverse, and to direct entry of such judgment as the circuit court should have rendered upon this evidence. As against defendant, no reason is apparent why specific performance should not be decreed. He has, perhaps, disabled himself from making a conveyance which,

alone, will be effective to transfer the title, but he has done so since suit was commenced, and to one who, while not a party, can have no rights greater than the defendant, since he purchased not only with the constructive notice resulting from the filing of the .complaint and *lis pendens*, but with the actual notice resulting from plaintiff's industry in serving upon him a copy of the notice of *lis pendens*.   A decree acting directly on the title to this land will therefore be as effective against McCoy as against the defendant himself. Sec. 3187, Stats. 1898; *Newton v. Marshall*, 62 Wis. 8.  Since a mere command to the defendant *Griswold* to execute a deed to the plaintiff would not secure to the latter the rights to which he is entitled, a decree should be entered which, upon payment of $3,400, of its own force transfers to the plaintiff all of the title which the defendants had at the time of the commencement of the suit, whether now vested in them or in any person claiming under them subsequent to that date, and which may be recorded in the registry of deeds.

*By the Court.*— Judgment reversed, and cause remanded with directions to enter judgment in favor of the plaintiff in accordance with this opinion.