BALCH, Respondent, vs. BEACH and another, Appellants.

*April 18—September 29, 1903.*

*Constitutional law: Municipal indebtedness: Limitation: Offsetting taxes: Warrants: Ratification of indebtedness: Equity: Jurisdiction: Relief against fraudulent judgment: Collusion of officers: Taxpayers' action: Fraud, actual and constructive.*

1. The rule that municipal revenues in process of collection should be counted against indebtedness in determining whether the constitutional limit in that regard has been exceeded, does not authorize offsetting taxes voted or levied till the same shall have been duly spread upon the tax roll and that placed in the hands of the proper municipal officer with authority to collect the tax.

2. A provision of law authorizing the issuance of municipal warrants upon the corporate treasury, where a fund for payment of indebtedness has been voted, treats only of power to issue evidence of established liabilities, not of that to incur indebtedness. Such warrants are merely evidence, *prima facie*, of the existence of indebtedness established and ready for payment, and are counted as such in solving whether the constitutional limitation in that regard has been reached.

3. Municipal indebtedness in excess of the constitutional limitation cannot be made good by ratification, since power to authorize originally is a condition precedent to the power to ratify subsequently.

4. Municipal indebtedness void at law because in excess of the constitutional limitation is void in equity, all persons dealing with the municipal corporation being presumed to know the limits of its power.

5. If one deals with a municipal corporation in respect to a matter beyond its corporate power and prohibited, he can have no relief, either at law or in equity, to save himself from loss; though in the absence of the element of prohibition he may obtain relief if not guilty of more than constructive wrong, so far as his money or property shall have been used by the municipality for its legitimate corporate purposes.

6. A court of equity has jurisdiction to grant relief from a judgment obtained by fraud perpetrated by the judgment creditor, the judgment debtor not being guilty of any inexcusable ignorance or negligence.

7. Equity jurisdiction is not competent to afford relief in the situation last mentioned by granting a new trial or disturbing the judgment, but is by acting upon the judgment creditor, preventing him from enforcing his judgment.

8. If public officers, by fraudulent collusion, neglect to perform their duties in respect to preventing the incorporation of invalid claims against their municipality in a judgment, taxpayers thereof, acting seasonably, may intervene by a suit in equity in the name of one or more of them acting for all, and successfully invoke its jurisdiction to restrain the collection of the judgment.

9. In the situation last stated the suing taxpayers act in a twofold capacity: as vindicators of their own right, and of that of the corporation. The existence of the latter being essential to that of the former, the suit is in form to enforce the right of the corporation. Whether the right and remedy of the corporation be legal or equitable, the right of the taxpayer is legal and his remedy equitable.

10. Equity suffers no wrong to exist without a remedy, the injury being sufficient to be appreciated by the conscience of the chancellor, and its jurisdiction being invoked seasonably and with clean hands.

11. The power of equity to protect the taxpaying public from loss by the misuse of public funds in the payment of invalid claims is not exhausted upon such claims being robed in a judgment, that being obtained by fraudulent collusion, actual or constructive.

12. The circumstance that municipal officers, having knowledge or reasonable means of knowledge, acting with ordinary attention to their duties, that claims sought to be put into judgment against the corporation are void, and knowing that the voters thereof have taken action adversely to the payment of the same, believing that they were void, permitted the person interested in enforcing such claims to obtain a judgment thereon by default, such officers being the persons upon whom the summons was required to be served in order to properly commence the suit, and omitted to bring the existence of the suit before the governing board of the corporation, there being members thereof, to their knowledge, in favor of contesting the claims, such officers making no good faith attempt to have the suit defended but allowing the judgment to be speedily entered after the action of the people condemning the claims involved and before the lapse of sufficient time under the circumstances for them to obtain knowledge of the pendency of

> the suit, shows clearly such fraudulent collusion to circum-
> vent the will of the taxpayers as to justify the exercise of
> equity jurisdiction to restrain the collection of the judgment.
> [Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Jackson
·county: JAMES O'NEILL, Circuit Judge. *Affirmed.*

Taxpayer's action to enjoin the collection of a judgment
·against Joint School District No. 1 of the towns of Melrose
and Irving. The facts were these: The assessed valuation of
the taxable property of the district for 1899 was $71,564,
and for 1900, $76,748. The number of inhabitants for said
years was 376. July 3, 1899, in form, at the annual school
meeting of the district, it was voted to obtain plans for a
school building to cost not to exceed $4,000, and a building
committee was appointed to carry out that idea. August 9,
1899, in form, the people of the district determined to bor-
row $2,500, and such determination was carried out, the
money being covered into the treasury. Thereupon the build-
ing committee obtained plans and proceeded to incur indebt-
·edness in the name of the district for the suggested school
building, no specific action, however, of the people of the dis-
·trict to build such building or to incur indebtedness in that
regard having been taken. June 30, 1900, the indebtedness
of the district was $5,076.55. There was then in the treas-
ury, in the building fund, $425.11, and in the general fund
·$245.50. Subsequently, during such year, $199.50 and no
more was paid into the treasury. After such date, and prior
·to October 1, 1900, the indebtedness on which the judgment,
the collection of which is here sought to be enjoined, was
based, except $41.25, was incurred in and about the construc-
tion of the schoolhouse, defendant, the judgment creditor,
being a member of the building committee, of which he con-
tinued to be a member until the judgment was rendered. The
·school building was completed prior to December 22, 1900,

the district receiving full value for all the money expended
in respect thereto.   The building was occupied for the pur-
poses for which it was constructed on and after October 4,
1900.   At the annual town meeting of the district for 1900,
the district board was in form directed to borrow in the name
of the district $1,000, but the authority so conferred was not
exercised.   At the same meeting a tax of $1,600 was in form
voted for building purposes.   Neither of the town boards at
any time certified to the necessity for such tax, nor did the dis-
trict clerk certify the vote to either of the town clerks. Decem-
ber 22, 1900, the district clerk certified to the two town clerks
that a $1,000 tax had been raised by the district on July 2,
1900, by its vote to raise $1,600 for building purposes.   In a
taxpayer's action commenced in January, 1901, the collection
of any tax based on such certificate was temporarily enjoined
and the injunction remains in force.   The action in which the
judgment in question in this case was rendered was com-
menced by service of the summons and complaint, in due
form, on the district clerk and district director.   No defense
was made to such action, nor did the treasurer of the district
know of its commencement until after judgment, though there
was no collusion between the plaintiff in such action and the
district officers in respect to the matter involved.   It was stip-
ulated upon this trial that at least $58.30 on account of the
judgment constituted valid indebtedness of the district.   De-
fendant *Mark Beach,* was, as indicated, a party on behalf of
the district, acting as a member of its building committee in
incurring the indebtedness put into the judgment.   He be-
came the owner of the claims against the district on account
of such indebtedness by assignment, and then put the same
into judgment while he was yet a member of the building
committee, as before indicated.

   Upon such facts the trial court decided that judgment
should be rendered permanently restraining the collection of

the judgment except as to $58.30, and judgment was so rendered.

For the appellants there were briefs by *Pope & Pope,* and oral argument by *Carl C. Pope.*

For the respondent there were briefs by *Higbee & Bunge,* and oral argument by *G. W. Bunge.*

The following opinion was filed May 29, 1903:

MARSHALL, J. The theory upon which the decision of the lower court was rendered is that the indebtedness, so called, forming the basis for the judgment, the collection of which is sought to be enjoined, had no existence in fact, being in excess of the constitutional authority of the district to incur; that its officers committed a breach of duty in not defending the action to effect on that ground; that under the circumstances the judgment is fraudulent in law; that in equity, at the suit of a party competent to move in the matter and seasonably moving, the collection of such judgment may be restrained; and that the void claims were not converted into valid claims by merely being put into judgment, even though such judgment was not permitted to be entered by any intentional neglect on the part of the district officers. The theory of appellants is that the indebtedness was not in excess of the constitutional limitation, first, because the tax voted at the district meeting, held July 2, 1900, should be counted as available assets under the rule on that subject; second, because the indebtedness was incurred in anticipation of the collection of a tax specifically voted to meet the same; third, because, if the indebtedness was void at the outset it was subsequently ratified by the district; fourth, because the judgment was not inequitable; fifth, because, there being no collusion between the judgment creditor and the officers of the district in putting the indebtedness into judgment, it is not competent for a court of equity to prevent its collection. We

will give such attention to each of such propositions as they seem to warrant.

1. The theory invoked by counsel in support of the first proposition, as regards what constitutes assets to be counted against liabilities of a municipality in determining whether, in respect to the latter, the constitutional limitation to incur the same has been exceeded, was formulated by this court in *Earles v. Wells,* 94 Wis. 285, 68 N. W. 964, in these words: "Money and assets in the treasury, and current revenues collected or *in process of immediate collection.*" That has since been several times approved. *State ex rel. M., T. & W. R. Co. v. Tomahawk,* 96 Wis. 73, 93, 71 N. W. 86; *Crogster v. Bayfield Co.* 99 Wis. 1, 74 N. W. 635, 77 N. W. 167; *Rice v. Milwaukee,* 100 Wis. 516, 521, 76 N. W. 341. In the last case cited it was held that the rule under discussion must be restrained to its specific meaning. Taxes in immediate process of collection do not include taxes merely voted. Taxes are not in immediate process of collection till the tax roll shall have been placed in the hands of the proper collecting officer with authority to receive, and with the right of the taxpayer to pay, the tax.

2. Counsel rests the second proposition on *Kane v. School District,* 52 Wis. 502, 505, 9 N. W. 459, 460, and *Scott v. School Directors,* 103 Wis. 280, 283, 79 N. W. 239, referring particularly to the following language of Mr. Justice TAYLOR in the first case mentioned:

"These provisions of the statute very clearly limit the power of the director and clerk of a school district to issue orders upon the treasurer of the district, to cases where the money is due and immediately payable to the person in whose favor the order is issued, and where the funds for the payment of such debt have been apportioned to such district, or have been voted by the district for the payment thereof."

That refers to the authority of school district officers, under the statute, to issue orders as a necessary step in the payment of valid debts already incurred, not to the authority of school

districts to incur indebtedness. Mr. Justice TAYLOR was very careful to explain that the statute deals with the authority to give out the mere instruments required by law to permit a disbursing officer of a municipality to pay its indebtedness; that it has nothing whatever to do with the power to contract debts; that a municipal debt is one thing, and an order for its payment, the mere evidence that the debt has been audited and is ready for payment, is quite another thing. The second case cited is along the same line. Manifestly, the subject discussed therein does not reach anything involved in this case. Outstanding orders of a municipal corporation upon its treasury are always taken account of in determining the amount of its indebtedness, but solely upon the theory that, *prima facie,* they evidence established indebtedness. Mere proof in any case that they were prematurely issued, the indebtedness in fact existing, will not militate against such indebtedness being considered on the question of whether the constitutional limitation in that regard has been exceeded, for the obvious reason that it is the substance that counts, not the mere evidence thereof. The making and setting afloat of the latter does not create a debt. It is of no significance whatever unless preceded by the debt itself, and it may not be where there is such indebtedness, as regards authority to draw money from the public treasury, if prematurely issued or issued without conformity to law, as held in *Kane v. School District, supra.*

3. On the subject of ratification, counsel invoke the familiar principle upon which the decision in *McGillivray v. Joint School District,* 112 Wis. 354, 88 N. W. 310, was grounded, that the ostensible act of a school district within the scope of its powers, the officers, however, proceeding in fact without being duly authorized, may subsequently be given original validity by ratification. That was applied in the *McGillivray Case* in this way: It was held that at the time the indebtedness in question was incurred in form the school district did

not have power to incur the same at all, except as to $594.44, and that, though it did not so execute its power in respect to such sum that a binding obligation of the district to pay it was incurred, for want of a proper authorization of its officers to make the contract in regard thereto, their action was subsequently ratified and given original validity by the power that might have originally conferred upon them authority in the matter, and so the district became bound. As we understand that case, it is decisively against the counsel's position that the indebtedness in question was made valid by ratification, for this reason: The district did not have authority to incur the indebtedness at all at the outset. Counsel say the district had authority to build a schoolhouse, and therefore, within the spirit of the rule of the *McGillivray Case,* it had authority to validate obligations incurred in form but not in fact, for school purposes. The power to build a schoolhouse is by itself too remote to bring the indebtedness in question within the rule under discussion. The constitutional limitation is not upon the power to build schoolhouses or do any particular thing requiring the expenditure of money or liable to cause the creation of municipal indebtedness; it is upon the power to incur the indebtedness.

4. The proposition that the judgment is not inequitable in view of the fact that it is based on indebtedness in form, absolutely void in fact because the district was prohibited from incurring the same, has, it seems, no support in sound reasoning or authority. The bar of the constitution against excessive municipal indebtedness would be very weak indeed to protect the taxpaying public if, when plainly overstepped, the resulting obligation could be enforced upon equitable grounds; or if a taxpayer, upon invoking the jurisdiction of equity to prevent its enforcement, were to himself meet the arm of equity raised in defense of an invasion of constitutional rights. No one can occupy a position of defiance to the fundamental law and defend himself successfully there-

under by invoking the jurisdiction of equity. That principle was clearly declared in *Thomson v. Elton*, 109 Wis. 589, 85 N. W. 425, and *McGillivray v. School District, supra,* in the holding that if a municipality obtains money of a person upon a contract which it not only has no power to make but is prohibited from making, such person has no equitable right to recover the same even though he may be able to show that it was in fact used for legitimate municipal purposes. Courts, in such a situation, both of law and equity, upon grounds of public policy, leave both parties where they have placed themselves.

5. The proposition that the facts do not warrant the exercise of equity power to prevent appellant from enjoying the benefit of his judgment, under the established rules of this court on the subject, is the most serious one to deal with. Its proper solution must be in the main, if not wholly, determined in the light of these principles:

(1) A court of equity has jurisdiction to relieve against a judgment upon the ground that it is contrary to equity where there is no other remedy, upon several different grounds, and among them fraud upon the party seeking the relief by the person who obtained the judgment, such party not being guilty of any inexcusable ignorance or negligence in the matter. *Stowell v. Eldred,* 26 Wis. 504; *Barber v. Rukeyser,* 39 Wis. 590; *Hiles v. Mosher,* 44 Wis. 601; *Johnson v. Coleman,* 23 Wis. 452; *Nevil v. Clifford,* 55 Wis. 161, 12 N. W. 419; *Crowns v. Forest L. Co.* 102 Wis. 97, 78 N. W. 433.

(2) The jurisdiction of equity is not exercised to disturb a judgment. That can only be done according to methods provided by the Code. But it acts directly upon the party who is in a position to and might, if not restrained of his liberty, enforce the judgment, tying his hands so as to prevent him from doing so, thus leaving the judgment good in form but valueless and harmless in fact. *Crowns v. Forest L. Co.,*

*supra; Zinc C. Co. v. First Nat. Bank,* 103 Wis. 135, 137, 79 N. W. 229; *Johnson v. Huber,* 106 Wis. 282, 82 N. W. 137; *Ludington v. Patton,* 111 Wis. 208, 86 N. W. 571.

(3) If public officers neglect to perform their official duties in respect to preventing the municipality from being burdened with the payment of illegal claims or suffering loss on account of money illegally paid out of the public funds, the taxpayers, in the name of one or more of such, suing in behalf of all, may intervene and remedy the mischief through the power of a court of equity. *Quaw v. Paff,* 98 Wis. 586, 74 N. W. 369; *Frederick v. Douglas Co.* 96 Wis. 411, 71 N. W. 798; *Land, L. & L. Co. v. McIntyre,* 100 Wis. 245, 75 N. W. 964; *S. C.* 100 Wis. 258, 75 N. W. 964; *Rice v. Milwaukee,* 100 Wis. 516, 76 N. W. 341; *Webster v. Douglas Co.* 102 Wis. 181, 77 N. W. 885, 78 N. W. 451; *Mulberger v. Beurhaus,* 102 Wis. 6, 78 N. W. 402; *Endion Imp. Co. v. Evening T. Co.* 104 Wis. 432, 80 N. W. 732; *Egaard v. Dahlke,* 109 Wis. 366, 85 N. W. 369; *St. Croix Co. v. Webster,* 111 Wis. 270, 87 N. W. 302; *Northern T. Co. v. Snyder,* 113 Wis. 516, 89 N. W. 460; *Kircher v. Pederson,* 117 Wis. 68, 93 N. W. 813.

(4) In such a case the person or persons invoking equity act in a twofold capacity: as vindicators of their own right, and also the right of the corporation. The existence of the latter right being essential to the existence of the former, the suit is in form one to enforce the right of the corporation. Those whose duty it is to guard its interests failing to do so, the members thereof are deemed to have a legal right, and to be entitled to an equitable remedy to protect it, to use the only jurisdiction that can afford them protection from the resulting injury, because the law courts cannot, operating of course by the old forms, afford a remedy. *Kircher v. Pederson, supra; Land, L. & L. Co. v. McIntyre, supra.*

(5) Above all and over all is the supreme principle to which the vigilant, clean-handed, but wronged party may re-

sort when all legal remedies fail, and even precedents for
an equitable remedy also, fitting the situation with exact-
ness as to facts,—that equity suffers no wrong to go without
a remedy, the wrong being of sufficient gravity to be appreci-
ated by the conscience of the chancellor, and application being
made to its jurisdiction seasonably and with clean hands.   Its
power and mastery of invention and the flexibility of its arm
enable it to fit an infinite variety of situations successfully
where otherwise wrongs would go unrighted.   Pomeroy, Eq.
Jur. 109.   Its administration is guarded and guided by prece-
dents, which, by judicial policy, fence in its operations more
or less closely according to subjects; but in its nature it is ex-
pansive, and so may break away *ex necessitate* and set a new
mark to meet a new situation, and does not hesitate to do so
when otherwise just rights would fail of vindication.   *Land,
L. & L. Co. v. McIntyre, supra.*

There are reasons which challenge our attention in support
of each of the alternatives mentioned in the last-stated prin-
ciple.   Which of them was in the judicial mind of the court
below, in ordering judgment upon the facts found, we are not
informed.   It decided that there was no collusion between
the school-district officers and the judgment creditor, permit-
ting the entry of the latter's judgment.   We must assume,
in view of all other facts found, and the undisputed evidence,
that the learned circuit court intended by that that there was
no actual concert of action having a specific wrongful purpose
in view, hence that relief could not be granted under that
familiar head of equity jurisprudence relating to relief from
judgments fraudulently entered.   In that light the court
must have grounded the judgment on constructive fraud,
deeming the general principles suggested in our second alter-
native ample under the circumstances to call equity power
into action.   It certainly would seem strange if, facing the
established doctrine that equity stands guard over the rights
of taxpayers to prevent threatened unlawful disbursement of

public money, and even to follow it when unlawfully disbursed and compel its restoration to the rightful owner, we were compelled to confess that, if unfaithful officers permit fictitious claims to be incorporated into a judgment, the jurisdiction of equity can then be challenged to say that the mere change of form has not been effective to make that right which was before wholly wrong, at the suit of the parties indirectly affected, who have had no opportunity, prior to the change, 'to act in the matter, and thus prevent the consummation of a wrong. In our judgment there is no such weakness in our system. A judgment is deemed to be right in law, *ex proprio vigore.* True, judgments are, as it were, the words of the law, and are received as truth,—*Judicia sunt tanquam juris dicta et pro veritate accipiuntur,*—but subject to the principle that fraud vitiates everything. In equity that which violates good conscience under all the circumstances may be relievable fraud in the eye of the chancellor, though not characterized by any specific wicked purpose. If it affects a judgment, that may yet stand in form as the infallible truth, *ex proprio vigore,* yet the use thereof be prevented by the jurisdiction of equity. While we may well refer to these principles to show the almost boundless resources of our system to repress and redress wrong, it is believed that we need not necessarily go beyond precedents for the purposes of this case. However, if precedents do not justify our conclusion, it seems that principles will vindicate it.

Respondent claims that the evidence established fraud in fact, notwithstanding the negative decision of the court, and invokes the rule that a judgment, right on the evidence, will not be disturbed on appeal though wrong upon the findings, due exception having been taken to such decision. *Maxwell v. Hartmann,* 50 Wis. 660, 8 N. W. 103; *Witt v. Trustees,* 55 Wis. 376, 13 N. W. 261; *Maldaner v. Smith,* 102 Wis. 30, 41, 78 N. W. 140; *Hamilton v. Menominee Falls Q. Co.*

106 Wis. 352, 81 N. W. 876; *Brown v. Griswold,* 109 Wis. 275, 285, 85 N. W. 363.

Before turning to that alternative to discover whether the judgment complained of has support, we will view it from the standpoint of the trial court. That collection of a judgment, entered by the fraudulent connivance of the plaintiff and the defendant sued in a representative capacity, or the plaintiff and those charged with the duty of guarding the rights of the defendant, may be enjoined by the defendant or any one specially injured, we need not stop to discuss at any great length. The rule in that regard is very old and firmly established. The following are good examples of its application:

In *Nevil v. Clifford,* 55 Wis. 161, 12 N. W. 419, judgment was allowed by the officers of a school district when they knew that there was a good defense to the claim involved and that the taxpayers desired that any attempt to enforce the claim should be resisted. Further reference will be made to that case. Such an action was maintained to enjoin the collection of a judgment in *Smith v. Cuyler,* 78 Ga. 654, 3 S. E. 406. It was said in respect to the right of the persons who apprehended danger from the collusive entry of judgments in actions to which they were not parties but were indirectly interested:

"The apprehended judgments at law will, if collusive, be utterly harmless to these complainants, because, if collusive, the complainants can attack them anywhere and everywhere. A collusive judgment is open to attack whenever and wherever it may come in conflict with the rights or the interest of third persons. Fraud is not a thing that can stand, even when robed in a judgment."

In *Meyer v. Butt,* 44 Ga. 468, 471, it was held that if a trustee collusively permits a judgment to be entered against him, the execution thereof may be enjoined in equity at the suit of the *cestui que trust,* and that if it appears to have been

for the interests of the trustee to permit the judgment to be entered, it will be presumed, in the absence of satisfactory evidence to the contrary, that he acted fraudulently in the matter. In *Hackett v. Manlove,* 14 Cal. 85, it was said that a collusive judgment creditor can be enjoined in equity at the suit of any one specially injured by the fraud, from enjoying his judgment to the prejudice of such other. In *Richardson v. Loree,* 94 Fed. 375, a collusive decree in favor of a person holding receiver's certificates, affecting the underlying bonds upon the property in the receiver's hands, was enjoined at the suit of the bondholders. The fact upon which the fraud was predicated was that the void character of the receiver's certificates was known to the receiver when judgment thereon was consented to by him.

Cases in great number, of the character referred to, might be cited. In some evidence of collusion was direct; in others it was indirect. In some the fraud was actual; in others it was constructive. We find no authority sustaining the doctrine that nothing short of collusion in the entry of a judgment, in the sense of the parties having a specific purpose to commit a fraud, will vitiate the judgment—that fraud in law is not sufficient to render it open to attack in a case of this kind—except *Cicero v. Picken,* 122 Ind. 260, 23 N. E. 763, and some other cases decided by the same court. If we were to approve the rule there laid down, the mere fact that the officers of the school district permitted the judgment to be entered in favor of appellant, under such circumstances as to be chargeable with knowledge that the claim sued upon was invalid, having remained passive in the matter for the purpose of allowing the plaintiff to recover, would not constitute relievable fraud in a taxpayer's action. However, when we come to examine that case carefully, we find that the decision was grounded on a statute which the court construed as preventing any relief from constructive fraud. An examination of the subsequent cases decided by the same court indicates

that the construction thus given to the statute became, in time, somewhat troublesome.   It was not always easy, evidently, to appreciate why a statute, merely laying down a rule that where fraud is necessary to an action it must be pleaded as a fact, established by evidence, and found as a fact in order to form a basis for judicial relief, should be said to preclude a person from being successfully charged with fraudulent conduct in the absence of a specific intent to injure, or fraud in fact.   In *Hutchinson v. First Nat. Bank,* 133 Ind. 271, 30 N. E. 952, the court said that the declaration in *Cicero v. Picken,* that by force of the statute there is no such thing in Indiana as constructive fraud or fraud in law, might be, as applied to some circumstances, "an overstatement of the law." In other cases it was said, in effect, that the statute merely put the burden of proof in all cases on the party alleging the fraud; that fraud, established and found as a fact, was relievable, though properly classed as constructive fraud.   However, the initial case in Indiana, where it was held that a recovery could not be had in circumstances similar to those before us, went upon the ground that only constructive fraud at most was established, and that fraud in law was not sufficient, in view of the statute, to warrant relief.

We need not stop to argue that no such statutory rule as that above mentioned prevails here.   If there was collusion between appellant and the officers of the school district in the proceedings which eventuated in the judgment, in the sense of concurrent action of such officers with appellant, either by active operations on the part of both, or on the part of one and passive concurrence on the part of the other, enabling appellant to wrongfully obtain the judgment, the latter knowing that there was no foundation for the claim and that the taxpayers of the district desired the same defended against, the judgment is fatally tainted with fraudulent collusion. If such officers ought to have known that the action was not maintainable, yet made no effort to discover the truth and

. to defend the district, and though they knew it was the wish
of the taxpayers to have a defense made, they aided appel-
lant to obtain his judgment by remaining passive in the mat-
ter, they were at least guilty of constructive fraud.

Collusion, to constitute relievable fraud in a case like this,
does not require, necessarily, any express agreement between
the officers and the claimant to aid the latter to obtain his
judgment, or any specific intent to injure.   Utter failure of
duty on the part of such officers to defend against a known
void claim or one which they have good reason to believe is
void from a desire to co-operate with the plaintiff to enable
him to obtain an advantage over the municipality; all parties
concerned knowing that the wishes of the taxpayers are being
violated, constitutes guilty collusion within the meaning of
the rule rendering a judgment open to attack in equity by the
person whose interests would otherwise be sacrificed.

The principles stated governed *Nevil v. Clifford,* 55 Wis.
161, 12 N. W. 419, which was very much like the case be-
fore us.   Indeed, the facts in the two cases are strikingly sim-
ilar.   In the *Nevil Case* there was a dispute about the right of
school officers to incur indebtedness for a schoolhouse.   The
structure had been completed and accepted so far as official
acts by the school officers could constitute acceptance.   A
school meeting was held thereafter and the subject of paying
the amount due upon the contract for the schoolhouse was
considered. . Adverse action was taken by a majority vote.
It was made known that the prevailing sentiment was that
any suit brought to enforce the contract should be defended.
Thereafter suit was brought upon the contract and the offi-
cers, instead of defending, answered admitting the plaintiff's
cause of action, thereby enabling him to promptly take judg-
ment before the taxpayers were aware of the existence of the
suit.   There were allegations in the complaint to the effect
stated, and in addition that the district officers acted fraudu-
lently in the matter.   Such additional allegations were plainly

predicated on the facts we have stated, as merely inferable therefrom. This court said of the complaint:

"We think the allegations of the complaint, if true, show that the judgment obtained by the *Cliffords* against the school district was obtained without any legal or equitable claim against the district, and that it was obtained by fraud and collusion with the officers of the district; and having been so obtained, the taxpayers of said district, or any one of them, may maintain an action in equity to have such judgment set aside and vacated in order to protect themselves against the levy of a tax for the payment thereof."

In this case, likewise, the indebtedness was contracted without authority of law. The situation was such that the officers of the district and appellant as well were chargeable with knowledge of all the facts. The question of whether the limit of indebtedness had been exceeded was determined by mere computation from facts presumably within their knowledge. They did not need legal assistance to aid them. Advice contrary to obvious facts would not excuse them. They did not act upon advice in fact, as will be hereafter shown. They were actors in contracting the indebtedness, and did it with their eyes open, so to speak. October 20, 1900, a school meeting was called and one of the questions for consideration was whether to vote a tax to the end that such indebtedness might be paid. Such officers were participants in the meeting. By a majority vote those present refused to raise money by taxation to replenish the building fund, thereby clearly indicating that they did not consider the claims valid. Promptly after the meeting appellant purchased such claims and brought suit thereon in his own name, making due service of the summons upon the director and the clerk. The whole conduct of the two district officers upon whom service was made, particularly that of the director who was the active member of the board, the two being in sympathy as it clearly appears with the faction in the district who favored paying the claim at all events, was well and seemingly calculated to

prevent rather than to made a defense to the suit. The misconduct of the director from the time the summons was served till the judgment was entered can hardly be explained upon any other reasonable theory than that of co-operation with the plaintiff. Keeping in mind that it was a matter of common talk in the district that the claims were void because, when the indebtedness was incurred, the limit of constitutional indebtedness for the district had been exceeded, that the voters of the district had, by majority vote, but a few days before the summons was served, made known their hostility to the payment of the claims, and that the district treasurer was opposed to their payment and had officially refused to recognize them as valid, this evidence seems to clearly condemn the director: He testified that the summons was served October 27, 1900; that the school board met November 3, thereafter; that he did not bring up the matter of the suit or consider it necessary to do so; that he did not at any time say anything to the treasurer about the pendency of the suit or care whether he knew of it or not, or say anything to any body in the district in regard thereto who was in favor of defending the suit; that he knew when the work was done that it was claimed that the constitutional indebtedness of the district had been exceeded and that it was common talk that the claims were invalid on that account; that he gave the summons to an attorney without any direction of the board so to do, telling such attorney to defend the case but not telling him upon what ground or saying anything to him about the matter of the constitutional indebtedness of the district having been exceeded when the indebtedness in question was incurred; that the attorney asked him what defense to put in, and that he told such attorney that he did not know; that the attorney asked him if the work the indebtedness represented was actually done, to which reply was made in the affirmative; that he did not want any defense made, though did not so instruct the attorney; that he told such attorney that the

district ought to pay the claim, but that such attorney was to look after the defense. The attorney testified that the whole matter was left to him by the director to use his own judgment whether to put in any defense or not. The treasurer testified that he was not informed of the existence of the suit until after the judgment was rendered, though it was known that he was opposed to the payment of the claims.

The upshot of the whole matter is that instead of the matter of the suit having been brought promptly to the attention of the board by the director at the first opportunity after the summons was served upon him and action taken to defend upon the ground which the members of the board at least had good reason to believe existed, the director assumed to have entire authority in the matter and in the execution of the same. While he went through the empty form of suggesting to the attorney to put in a defense, he did not acquaint such attorney with the facts or conduct himself in the way a faithful officer naturally would if acting in good faith in such a situation. It seems clear that he purposely allowed the suit to go by default, by reason whereof, in the space of thirty days after the refusal of the taxpayers to vote a tax to pay the claims, they were put into judgment without such taxpayers, who were opposed to such payment, or the officer who particularly represented them upon the board, knowing that a suit had been commenced. Why this court's characterization of the facts pleaded in the *Nevil Case* does not apply here we are unable to perceive. In each case the facts indicate co-operation on the part of district officers, with the plaintiff, to incorporate in a judgment invalid claims or claims regardless of whether they were valid or not, contrary to the will of a majority of the taxpayers. If there is any distinction between the two cases, as to essential particulars, it seems that the indications of fraudulent collusion in this case are the most significant. Here, after the refusal of the taxpayers to provide for the disputed claims, the very person who, as the

agent of the district, contracted them and was necessarily familiar with all the facts, bought them up for the evident purpose of enforcing their payment against the will of the district, obviously expecting co-operation with him by the director, and he certainly was not disappointed in that regard. The director co-operated just as effectively and in a manner more clearly indicating, we should say, a disposition to circumvent the wishes of the taxpayers than did the officers in the *Nevil Case.* To our minds the appellants' judgment is fatally tainted with fraudulent collusion. Perhaps, regarding the finding of the trial court as a decision that there was no specific intent on the part of the director to commit a fraud, the determination that there was no collusion between him and *Mark Beach,* might be sustained, though the evidence, as claimed by respondent, indicates quite strongly something worse than mere constructive fraud. Under the Indiana statute, as construed by its court, the findings here would not support the judgment for want of a specific decision that there was fraud in fact. But since the evidentiary facts found and the undisputed evidence clearly establish at least constructive fraud as an inference of fact, and as a matter of law, the contrary inference drawn by the trial court, even if we were to regard it as a finding, even against constructive fraud, could not prevent the judgment complained of being affirmed as it seems that it must be.

*By the Court.*—Judgment affirmed.

WINSLOW and DODGE, JJ., dissent.
A motion for a rehearing was denied September 29, 1903.